```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 14 Cr. 130 (LAP) |
| -against- | ORDER |
| COURTNEY HARDIN, | |
| Defendant. | |

LORETTA A. PRESKA, Senior United States District Judge:

In response to Defendant Courtney Hardin's letter to the Court, (dkt. no. 281), enclosed are copies of United States v. Davis, 139 S. Ct. 2319 (2019) and United States v. Barrett, 937 F.3d 126 (2d Cir. 2019).  To the extent Mr. Hardin seeks additional information, he should contact the Pro Se Clinic at 40 Centre Street, New York, NY 10007.  A copy of this order has been mailed to Mr. Hardin.

**SO ORDERED.**

```
Dated:    New York, New York
          April 21, 2020
```

_Loretta A. Presley_
_____
LORETTA A. PRESKA
Senior United States District Judge

1

(Slip Opinion)     OCTOBER TERM, 2018     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* DAVIS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 18–431.  Argued April 17, 2019—Decided June 24, 2019

Respondents Maurice Davis and Andre Glover were charged with multiple counts of Hobbs Act robbery and one count of conspiracy to commit Hobbs Act robbery.  They were also charged under 18 U. S. C. §924(c), which authorizes heightened criminal penalties for using, carrying, or possessing a firearm in connection with any federal "crime of violence or drug trafficking crime." §924(c)(1)(A).  "Crime of violence" is defined in two subparts: the elements clause, §924(c)(3)(A), and the residual clause, §924(c)(3)(B).  The residual clause in turn defines a "crime of violence" as a felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Ibid.*  A jury convicted the men on most of the underlying charges and on two separate §924(c) charges for brandishing a firearm in connection with their crimes.  The Fifth Circuit initially rejected their argument that §924(c)'s residual clause is unconstitutionally vague, but on remand in light of *Sessions* v. *Dimaya,* 584 U. S. ___, the court reversed course and held §924(c)(3)(B) unconstitutional.  It then held that Mr. Davis's and Mr. Glover's convictions on the §924(c) count charging robbery as the predicate crime of violence could be sustained under the elements clause, but that the other count—which charged conspiracy as a predicate crime of violence—could not be upheld because it depended on the residual clause.

*Held*: Section 924(c)(3)(B) is unconstitutionally vague. Pp. 4–25.

(a) In our constitutional order, a vague law is no law at all.  The vagueness doctrine rests on the twin constitutional pillars of due process and separation of powers.  This Court has recently applied the doctrine in two cases involving statutes that bear more than a pass-

2                    UNITED STATES *v.* DAVIS

ing resemblance to §924(c)(3)(B)'s residual clause—*Johnson* v. *United States*, 576 U. S. ___, which addressed the residual clause of the Armed Career Criminal Act (ACCA), and *Sessions* v. *Dimaya*, which addressed the residual clause of 18 U. S. C. §16. The residual clause in each case required judges to use a "categorical approach" to determine whether an offense qualified as a violent felony or crime of violence. Judges had to disregard how the defendant actually committed the offense and instead imagine the degree of risk that would attend the idealized "'ordinary case'" of the offense. *Johnson*, 576 U. S., at ___. The Court held in each case that the imposition of criminal punishments cannot be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined "ordinary case." The government and lower courts have long understood §924(c)(3)(B) to require the same categorical approach. Now, the government asks this Court to abandon the traditional categorical approach and hold that the statute commands a case-specific approach that would look at the defendant's actual conduct in the predicate crime. The government's case-specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya* and would not yield to the same practical and Sixth Amendment complications that a case-specific approach under the ACCA and §16 would, but this approach finds no support in §924(c)'s text, context, and history. Pp. 4–9.

(b) This Court has already read the nearly identical language of §16(b) to mandate a categorical approach. See *Leocal* v. *Ashcroft*, 543 U. S. 1, 7. And what is true of §16(b) seems at least as true of §924(c)(3)(B). The government claims that the singular term "offense" carries the "generic" meaning in connection with the elements clause but a "specific act" meaning in connection with the residual clause, but nothing in §924(c)(3)(B) rebuts the presumption that the single term "offense" bears a consistent meaning. This reading is reinforced by the language of the residual clause itself, which speaks of an offense that, "by its nature," involves a certain type of risk. Pp. 9–12.

(c) The categorical reading is also reinforced by §924(c)(3)(B)'s role in the broader context of the federal criminal code. Dozens of federal statutes use the phrase "crime of violence" to refer to presently charged conduct. Some cross-reference §924(c)(3)'s definition, while others are governed by the virtually identical definition in §16. The choice appears completely random. To hold that §16(b) requires the categorical approach while §924(c)(3)(B) requires the case-specific approach would make a hash of the federal criminal code. Pp. 12–13.

(d) Section 924(c)(3)(B)'s history provides still further evidence that it carries the same categorical-approach command as §16(b). When

Syllabus

Congress enacted the definition of "crime of violence" in §16 in 1984, it also employed the term in numerous places in the Act, including §924(c). The two statutes, thus, were originally designed to be read together. And when Congress added a definition of "crime of violence" to §924(c) in 1986, it copied the definition from §16 without making any material changes to the language of the residual clause, which would have been a bizarre way of suggesting that the two clauses should bear drastically different meanings. Moreover, §924(c) originally prohibited the use of a firearm in connection with *any* federal felony, before Congress narrowed §924(c) in 1984 by limiting its predicate offenses to "crimes of violence." The case-specific reading would go a long way toward nullifying that limitation and restoring the statute's original breadth. Pp. 14–17.

(e) Relying on the canon of constitutional avoidance, the government insists that if the case-specific approach does not represent the best reading of the statute, it is nevertheless the Court's duty to adopt any "fairly possible" reading to save the statute from being unconstitutional. But it is doubtful the canon could play a proper role in this case even if the government's reading were "possible." This Court has sometimes adopted the *narrower* construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly, but it has not invoked the canon to *expand* the reach of a criminal statute in order to save it. To do so would risk offending the very same due process and separation of powers principles on which the vagueness doctrine itself rests and would sit uneasily with the rule of lenity's teaching that ambiguities about a criminal statute's breadth should be resolved in the defendant's favor. Pp. 17–19.

903 F. 3d 483, affirmed in part, vacated in part, and remanded.

GORSUCH, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KAVANAUGH, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined, and in which ROBERTS, C. J., joined as to all but Part II–C.

Cite as: 588 U. S. ____ (2019)            1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–431

_____

## UNITED STATES, PETITIONER *v.* MAURICE LAMONT DAVIS AND ANDRE LEVON GLOVER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2019]

JUSTICE GORSUCH delivered the opinion of the Court.

In our constitutional order, a vague law is no law at all. Only the people's elected representatives in Congress have the power to write new federal criminal laws.  And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them.  Vague laws transgress both of those constitutional requirements.  They hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct.  When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.

Today we apply these principles to 18 U. S. C. §924(c). That statute threatens long prison sentences for anyone who uses a firearm in connection with certain other federal crimes.  But *which* other federal crimes?  The statute's residual clause points to those felonies "that by [their] nature, involv[e] a substantial risk that physical force

Opinion of the Court

against the person or property of another may be used in
the course of committing the offense." §924(c)(3)(B). Even
the government admits that this language, read in the
way nearly everyone (including the government) has long
understood it, provides no reliable way to determine which
offenses qualify as crimes of violence and thus is unconsti-
tutionally vague. So today the government attempts a
new and alternative reading designed to save the residual
clause. But this reading, it turns out, cannot be squared
with the statute's text, context, and history. Were we to
adopt it, we would be effectively stepping outside our role
as judges and writing a new law rather than applying the
one Congress adopted.

I

After Maurice Davis and Andre Glover committed a
string of gas station robberies in Texas, a federal prosecu-
tor charged both men with multiple counts of robbery
affecting interstate commerce in violation of the Hobbs
Act, 18 U. S. C. §1951(a), and one count of conspiracy to
commit Hobbs Act robbery. The prosecutor also charged
Mr. Davis with being a felon in possession of a firearm. In
the end, a jury acquitted Mr. Davis of one robbery charge
and otherwise found the men guilty on all counts. And
these convictions, none of which are challenged here,
authorized the court to impose prison sentences of up to 70
years for Mr. Davis and up to 100 years for Mr. Glover.

But that was not all. This appeal concerns *additional*
charges the government pursued against the men under
§924(c). That statute authorizes heightened criminal
penalties for using or carrying a firearm "during and in
relation to," or possessing a firearm "in furtherance of,"
any federal "crime of violence or drug trafficking crime."
§924(c)(1)(A). The statute proceeds to define the term
"crime of violence" in two subparts—the first known as the
elements clause, and the second the residual clause.

According to §924(c)(3), a crime of violence is "an offense that is a felony" and

> "(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> "(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

Violators of §924(c) face a mandatory minimum sentence of five years in prison, over and above any sentence they receive for the underlying crime of violence or drug trafficking crime. The minimum sentence rises to 7 years if the defendant brandishes the firearm and 10 years if he discharges it. Certain types of weapons also trigger enhanced penalties—for example, a defendant who uses a short-barreled shotgun faces a minimum sentence of 10 years. And repeat violations of §924(c) carry a minimum sentence of 25 years.[1]

At trial, the government argued that Mr. Davis and Mr. Glover had each committed two separate §924(c) violations by brandishing a short-barreled shotgun in connection with their crimes. Here, too, the jury agreed. These convictions yielded a mandatory minimum sentence for each man of 35 years, which had to run consecutively to their other sentences. Adding the §924(c) mandatory minimums to its discretionary sentences for their other crimes, the district court ultimately sentenced Mr. Glover to more

---

[1] When this case was tried, a defendant convicted of two §924(c) violations in a single prosecution faced a 25-year minimum for the second violation. See *Deal* v. *United States*, 508 U. S. 129, 132 (1993); §1(a)(1), 112 Stat. 3469. In 2018, Congress changed the law so that, going forward, only a second §924(c) violation committed "after a prior [§924(c)] conviction . . . has become final" will trigger the 25-year minimum. Pub. L. 115–391, §403(a), 132 Stat. 5221.

than 41 years in prison and Mr. Davis to more than 50 years.

On appeal, both defendants argued that §924(c)'s residual clause is unconstitutionally vague. At first, the Fifth Circuit rejected the argument. *United States* v. *Davis*, 677 Fed. Appx. 933, 936 (2017) (*per curiam*). But after we vacated its judgment and remanded for further consideration in light of our decision in *Sessions* v. *Dimaya*, 584 U. S. ___ (2018), striking down a different, almost identically worded statute, the court reversed course and held §924(c)(3)(B) unconstitutional. 903 F. 3d 483, 486 (2018) (*per curiam*). It then held that Mr. Davis's and Mr. Glover's convictions on one of the two §924(c) counts, the one that charged *robbery* as a predicate crime of violence, could be sustained under the elements clause. But it held that the other count, which charged *conspiracy* as a predicate crime of violence, depended on the residual clause; and so it vacated the men's convictions and sentences on that count.

Because the Fifth Circuit's ruling deepened a dispute among the lower courts about the constitutionality of §924(c)'s residual clause, we granted certiorari to resolve the question. 586 U. S. ___ (2018).[2]

II

Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers. See *Dimaya*, 584 U. S., at ___–___ (plurality opinion) (slip op., at 4–5); *id.*, at ___–___

––––––––––

[2] Compare *United States* v. *Simms*, 914 F. 3d 229, 236–246 (CA4 2019) (en banc), *United States* v. *Salas*, 889 F. 3d 681, 685–686 (CA10 2018), and *United States* v. *Eshetu*, 898 F. 3d 36, 37–38 (CADC 2018) (holding that §924(c)(3)(B) is vague), with *United States* v. *Douglas*, 907 F. 3d 1, 11–16 (CA1 2018), *Ovalles* v. *United States*, 905 F. 3d 1231, 1240–1252 (CA11 2018) (en banc), and *United States* v. *Barrett*, 903 F. 3d 166, 178–184 (CA2 2018) (taking the opposite view).

Opinion of the Court

(GORSUCH, J., concurring in part and concurring in judgment) (slip op., at 2–9).  Vague laws contravene the "first essential of due process of law" that statutes must give people "of common intelligence" fair notice of what the law demands of them.  *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926); see *Collins* v. *Kentucky*, 234 U. S. 634, 638 (1914).  Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect.  Only the people's elected representatives in the legislature are authorized to "make an act a crime." *United States* v. *Hudson*, 7 Cranch 32, 34 (1812).  Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide.  See *Kolender* v. *Lawson*, 461 U. S. 352, 357–358, and n. 7 (1983); *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89–91 (1921); *United States* v. *Reese*, 92 U. S. 214, 221 (1876).

   In recent years, this Court has applied these principles to two statutes that bear more than a passing resemblance to §924(c)(3)(B)'s residual clause.  In *Johnson* v. *United States*, 576 U. S. ___ (2015), the Court addressed the residual clause of the Armed Career Criminal Act (ACCA), which defined a "violent felony" to include offenses that presented a "serious potential risk of physical injury to another." §924(e)(2)(B)(ii).  The ACCA's residual clause required judges to use a form of what we've called the "categorical approach" to determine whether an offense qualified as a violent felony.  Following the categorical approach, judges had to disregard how the defendant actually committed his crime.  Instead, they were required to imagine the idealized "'ordinary case'" of the defendant's crime and then guess whether a "'serious potential risk of physical injury to another'" would attend its commission.  *Id.*, at ___ (slip op., at 4).  *Johnson* held this

Opinion of the Court

judicial inquiry produced "more unpredictability and arbitrariness" when it comes to specifying unlawful conduct than the Constitution allows. *Id.*, at ___–___ (slip op., at 5–6).

Next, in *Sessions* v. *Dimaya*, we considered the residual clause of 18 U. S. C. §16, which defines a "crime of violence" for purposes of many federal statutes. Like §924(c)(3), §16 contains an elements clause and a residual clause. The only difference is that §16's elements clause, unlike §924(c)(3)'s elements clause, isn't limited to felonies; but there's no material difference in the language or scope of the statutes' residual clauses.[3] As with the ACCA, our precedent under §16's residual clause required courts to use the categorical approach to determine whether an offense qualified as a crime of violence. *Dimaya*, 584 U. S., at ___–___ (slip op., at 2–3); see *Leocal* v. *Ashcroft*, 543 U. S. 1, 7, 10 (2004). And, again as with the ACCA, we held that §16's residual clause was unconstitutionally vague because it required courts "to picture the kind of conduct that the crime involves in the ordinary case, and to judge whether that abstraction presents some not-well-specified-yet-sufficiently-large degree of risk." *Dimaya*, 584 U. S., at ___ (slip op., at 11) (internal quotation marks omitted).

What do *Johnson* and *Dimaya* have to say about the statute before us? Those decisions teach that the imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined "ordinary case." But does §924(c)(3)(B) require that sort of inquiry? The government and lower courts

——————

[3] Section 16 provides that the term "crime of violence" means "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

have long thought so. For years, almost everyone under-
stood §924(c)(3)(B) to require exactly the same categorical
approach that this Court found problematic in the residual
clauses of the ACCA and §16.[4] Today, the government
acknowledges that, if this understanding is correct, then
§924(c)(3)(B) must be held unconstitutional too.

But the government thinks it has now found a way
around the problem. In the aftermath of our decisions
holding the residual clauses of the ACCA and §16(b) un-
constitutionally vague, the government "abandon[ed] its
longstanding position" that §924(c)(3)(B) requires a cate-
gorical analysis and began urging lower courts to "adopt a
new 'case specific' method" that would look to "the 'de-
fendant's actual conduct' in the predicate offense." 903
F. 3d, at 485. Now, the government tries the same strat-
egy in this Court, asking us to abandon the traditional
categorical approach and hold that the statute actually
commands the government's new case-specific approach.
So, while the consequences in this case may be of constitu-
tional dimension, the real question before us turns out to
be one of pure statutory interpretation.

In approaching the parties' dispute over the statute's
meaning, we begin by acknowledging that the government

─────────

[4] See, e.g., United States v. Acosta, 470 F. 3d 132, 134–135 (CA2
2006); United States v. Butler, 496 Fed. Appx. 158, 161 (CA3 2012);
United States v. Fuertes, 805 F. 3d 485, 498 (CA4 2015); United States
v. Williams, 343 F. 3d 423, 431 (CA5 2003); Evans v. Zych, 644 F. 3d
447, 453 (CA6 2011); United States v. Jackson, 865 F. 3d 946, 952 (CA7
2017), vacated and remanded, 584 U. S. ___ (2018); United States v.
Moore, 38 F. 3d 977, 979–980 (CA8 1994); United States v. Amparo, 68
F. 3d 1222, 1225–1226 (CA9 1995); United States v. Munro, 394 F. 3d
865, 870 (CA10 2005); United States v. McGuire, 706 F. 3d 1333, 1336–
1337 (CA11 2013); United States v. Kennedy, 133 F. 3d 53, 56 (CADC
1998); see also Ovalles v. United States, 905 F. 3d 1231, 1295 (CA11
2018) (en banc) (J. Pryor, J., dissenting) ("For years, and even after
Johnson, the government consistently has urged that we apply a
categorical approach to §924(c)").

is right about at least two things. First, a case-specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya*. In those cases, we recognized that there would be no vagueness problem with asking a jury to decide whether a defendant's "'real-world conduct'" created a substantial risk of physical violence. *Dimaya*, 584 U. S., at ___–___ (slip op., at 10–11); see *Johnson*, 576 U. S., at ___, ___ (slip op., at 6, 12). Second, a case-specific approach wouldn't yield the same practical and Sixth Amendment complications under §924(c) that it would have under the ACCA or §16. Those other statutes, in at least some of their applications, required a *judge* to determine whether a defendant's *prior conviction* was for a "crime of violence" or "violent felony." In that context, a case-specific approach would have entailed "reconstruct[ing], long after the original conviction, the conduct underlying that conviction." *Id.*, at ___ (slip op., at 13). And having a judge, not a jury, make findings about that underlying conduct would have "raise[d] serious Sixth Amendment concerns." *Descamps* v. *United States*, 570 U. S. 254, 269–270 (2013). By contrast, a §924(c) prosecution focuses on the conduct with which the defendant is *currently charged*. The government already has to prove to a jury that the defendant committed all the acts necessary to punish him for the underlying crime of violence or drug trafficking crime. So it wouldn't be that difficult to ask the jury to make an additional finding about whether the defendant's conduct also created a substantial risk that force would be used.

But all this just tells us that it might have been a good idea for Congress to have written a residual clause for §924(c) using a case-specific approach. It doesn't tell us whether Congress actually wrote such a clause. To answer *that* question, we need to examine the statute's text, context, and history. And when we do that, it becomes clear that the statute simply cannot support the govern-

ment's newly minted case-specific theory.

### III

### A

Right out of the gate, the government faces a challenge. This Court, in a unanimous opinion, has already read the nearly identical language of 18 U. S. C. §16(b) to mandate a categorical approach. And, importantly, the Court did so without so much as mentioning the practical and constitutional concerns described above. Instead, the Court got there based entirely on the text. In *Leocal*, the Court wrote:

> "In determining whether petitioner's conviction falls within the ambit of §16, the statute directs our focus to the 'offense' of conviction. See §16(a) (defining a crime of violence as '*an offense* that has *as an element* the use . . . of physical force against the person or property of another' (emphasis added)); §16(b) (defining the term as '*any other offense* that is a felony and that, *by its nature*, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense' (emphasis added)). This language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." 543 U. S., at 7.

*Leocal* went on to suggest that burglary would always be a crime of violence under §16(b) "because burglary, *by its nature*, involves a substantial risk that the burglar will use force against a victim in completing the crime," regardless of how any *particular* burglar might act on a specific occasion. *Id.*, at 10 (emphasis added); see also *Dimaya*, 584 U. S., at ___ (slip op., at 14) (plurality opinion) (reaffirming that "§16(b)'s text . . . demands a categorical approach"). And what was true of §16(b) seems to us

Opinion of the Court

at least as true of §924(c)(3)(B): It's not even close; the statutory text commands the categorical approach.

Consider the word "offense." It's true that "in ordinary speech," this word can carry at least two possible meanings. It can refer to "a generic crime, say, the crime of fraud or theft in general," or it can refer to "the specific acts in which an offender engaged on a specific occasion." *Nijhawan* v. *Holder*, 557 U. S. 29, 33–34 (2009). But the word "offense" appears just once in §924(c)(3), in the statute's prefatory language. And everyone agrees that, in connection with the elements clause, the term "offense" carries the first, "generic" meaning. Cf. *id.*, at 36 (similar language of the ACCA's elements clause "refers directly to generic crimes"). So reading this statute most naturally, we would expect "offense" to retain that same meaning in connection with the residual clause. After all, "[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." *Cochise Consultancy, Inc.* v. *United States ex rel. Hunt*, 587 U. S. ___, ___ (2019) (slip op., at 5).

To prevail, the government admits it must persuade us that the singular term "offense" bears a split personality in §924(c), carrying the "generic" meaning in connection with the elements clause but then taking on the "specific act" meaning in connection with the residual clause. And, the government suggests, this isn't quite as implausible as it may sound; sometimes the term "offense" *can* carry both meanings simultaneously. To illustrate its point, the government posits a statute defining a "youthful gun crime" as "an offense that has as an element the use of a gun and is committed by someone under the age of 21." Tr. of Oral Arg. 16. This statute, the government suggests, would leave us little choice but to understand the single word "offense" as encompassing both the generic crime and the manner of its commission on a specific occasion. To which we say: Fair enough. It's *possible* for

Opinion of the Court

surrounding text to make clear that "offense" carries a double meaning.  But absent evidence to the contrary, we presume the term is being used consistently.  And nothing in §924(c)(3)(B) comes close to rebutting that presumption.

Just the opposite.  The language of the residual clause itself reinforces the conclusion that the term "offense" carries the same "generic" meaning throughout the statute.  Section 924(c)(3)(B),  just like §16(b), speaks of an offense that, "by its nature," involves a certain type of risk. And that would be an exceedingly strange way of referring to the circumstances of a specific offender's conduct.  As both sides agree, the "nature" of a thing typically denotes its "'normal and characteristic quality,'" *Dimaya*, 584 U. S., at ___ (slip op., at 14) (quoting Webster's Third New International Dictionary 1507 (2002)), or its "'basic or inherent features,'" *United States* v. *Barrett*, 903 F. 3d 166, 182 (CA2 2018) (quoting Oxford Dictionary of English 1183 (A. Stevenson ed., 3d ed. 2010)).  So in plain English, when we speak of the nature of an offense, we're talking about "what an offense normally—or, as we have repeatedly said, 'ordinarily'—entails, not what happened to occur on one occasion." *Dimaya*, 584 U. S., at ___ (slip op., at 14); see *Leocal*, 543 U. S., at 7 (contrasting the "nature of the offense" with "the particular facts [of] petitioner's crime").[5]

Once again, the government asks us to overlook this obvious reading of the text in favor of a strained one.  It suggests that the statute might be referring to the "na-

_____

[5]The government's own regulations reflect this understanding of the ordinary meaning of "by its nature."  A Department of Justice regulation provides that an inmate is not eligible for early release if he was convicted of an offense "that, by its nature *or conduct*, presents a serious potential risk of physical force."  28 CFR §550.55(b)(5)(iii) (2017) (emphasis added); see *Bush* v. *Pitzer*, 133 F. 3d 455, 458 (CA7 1997) (denying early release because "[c]onspiracy does not by its 'nature' present a serious risk; but Bush's 'conduct' did so").

Opinion of the Court

ture" of the defendant's conduct on a particular occasion.
But while this reading may be linguistically feasible, we
struggle to see why, if it had intended this meaning, Con-
gress would have used the phrase "by its nature" at all.
The government suggests that "by its nature" keeps the
focus on the offender's *conduct* and excludes evidence
about his *personality*, such as whether he has violent
tendencies. But even without the words "by its nature,"
nothing in the statute remotely suggests that courts are
allowed to consider character evidence—a type of evidence
usually off-limits during the guilt phase of a criminal trial.
Cf. Fed. Rule Evid. 404.

B

Things become clearer yet when we consider
§924(c)(3)(B)'s role in the broader context of the federal
criminal code. As we've explained, the language of
§924(c)(3)(B) is almost identical to the language of §16(b),
which this Court has read to mandate a categorical ap-
proach. And we normally presume that the same lan-
guage in related statutes carries a consistent meaning.
See, *e.g.*, *Sullivan* v. *Stroop*, 496 U. S. 478, 484 (1990).

This case perfectly illustrates why we do that. There
are dozens of federal statutes that use the phrase "crime of
violence" to refer to presently charged conduct rather than
a past conviction. Some of those statutes cross-reference
the definition of "crime of violence" in §924(c)(3), while
others are governed by the virtually identical definition in
§16. The choice appears completely random. Reading the
similar language in §924(c)(3)(B) and §16(b) similarly
yields sensibly congruent applications across all these
other statutes. But if we accepted the government's invi-
tation to reinterpret §924(c)(3)(B) as alone endorsing a
case-specific approach, we would produce a series of seem-
ingly inexplicable results.

Take just a few examples. If the government were right,

Opinion of the Court

Congress would have mandated the case-specific approach in a prosecution for providing explosives to facilitate a crime of violence, 18 U. S. C. §844(*o*), but the (now-invalidated) categorical approach in a prosecution for providing *information about* explosives to facilitate a crime of violence, §842(p)(2). It would have mandated the case-specific approach in a prosecution for using false identification documents in connection with a crime of violence, §1028(b)(3)(B), but the categorical approach in a prosecution for using confidential phone records in connection with a crime of violence, §1039(e)(1). It would have mandated the case-specific approach in a prosecution for giving someone a firearm to use in a crime of violence, §924(h), but the categorical approach in a prosecution for giving a minor a handgun to use in a crime of violence, §924(a)(6)(B)(ii). It would have mandated the case-specific approach in a prosecution for traveling to another State to acquire a firearm for use in a crime of violence, §924(g), but the categorical approach in a prosecution for traveling to another State to *commit* a crime of violence, §1952(a)(2). And it would have mandated the case-specific approach in a prosecution for carrying armor-piercing ammunition in connection with a crime of violence, §924(c)(5), but the categorical approach in a prosecution for carrying a firearm while "in possession of armor piercing ammunition capable of being fired in that firearm" in connection with a crime of violence, §929(a)(1).

There would be no rhyme or reason to any of this. Nor does the government offer any plausible account why Congress would have wanted courts to take such dramatically different approaches to classifying offenses as crimes of violence in these various provisions. To hold, as the government urges, that §16(b) requires the categorical approach while §924(c)(3)(B) requires the case-specific approach would make a hash of the federal criminal code.

### C

Section 924(c)(3)(B)'s history provides still further evidence that it carries the same categorical-approach command as §16(b). It's no accident that the language of the two laws is almost exactly the same. The statutory term "crime of violence" traces its origins to the Comprehensive Crime Control Act of 1984. There, Congress enacted the definition of "crime of violence" in §16. §1001(a), 98 Stat. 2136. It also "employed the term 'crime of violence' in numerous places in the Act," *Leocal*, 543 U. S., at 6, including in §924(c). §1005(a), 98 Stat. 2138. At that time, Congress didn't provide a separate definition of "crime of violence" in §924(c) but relied on §16's general definition. The two statutes, thus, were originally designed to be read together.

Admittedly, things changed a bit over time. Eventually, Congress expanded §924(c)'s predicate offenses to include drug trafficking crimes as well as crimes of violence. §§104(a)(2)(B)–(C), 100 Stat. 457. When it did so, Congress added a subsection-specific definition of "drug trafficking crime" in §924(c)(2)—and, perhaps thinking that both terms should be defined in the same place, it also added a subsection-specific definition of "crime of violence" in §924(c)(3). §104(a)(2)(F), *id.*, at 457. But even then, Congress didn't write a new definition of that term. Instead, it copied and pasted the definition from §16 without making any material changes to the language of the residual clause. The government suggests that, in doing so, Congress "intentionally separated" and "decoupled" the two definitions. Brief for United States 34, 37. But importing the residual clause from §16 into §924(c)(3) almost word for word would have been a bizarre way of suggesting that the two clauses should bear drastically different meanings. Usually when statutory language "'is obviously transplanted from . . . other legislation,'" we have reason to think "'it brings the old soil with it.'" *Sekhar* v. *United*

*States*, 570 U. S. 729, 733 (2013).

What's more, when Congress copied §16(b)'s language into §924(c) in 1986, it proceeded on the premise that the language *required* a categorical approach. By then courts had, as the government puts it, "beg[u]n to settle" on the view that §16(b) demanded a categorical analysis. Brief for United States 36–37. Of particular significance, the Second Circuit, along with a number of district courts, had relied on the categorical approach to hold that selling drugs could *never* qualify as a crime of violence because "[w]hile the traffic in drugs is often accompanied by violence," it can also be carried out through consensual sales and thus "does not *by its nature* involve substantial risk that physical violence will be used." *United States* v. *Diaz*, 778 F. 2d 86, 88 (1985). Congress moved quickly to abrogate those decisions. But, notably, it didn't do so by directing a case-specific approach or changing the language courts had read to require the categorical approach. Instead, it accepted the categorical approach as given and simply declared that certain drug trafficking crimes automatically trigger §924 penalties, regardless of the risk of violence that attends them. §§104(a)(2)(B)–(C), 100 Stat. 457.

The government's reply to this development misses the mark. The government argues that §16(b) had not acquired such a well-settled judicial construction by 1986 that the reenactment of its language in §924(c)(3)(B) should be presumed to have incorporated the same construction. We agree. See *Jerman* v. *Carlisle, McNellie, Rini, Kramer & Ulrich, L. P. A.*, 559 U. S. 573, 590 (2010) (interpretations of three courts of appeals "may not have 'settled' the meaning" of a statute for purposes of the reenactment canon). But Congress in 1986 did more than just reenact language that a handful of courts had interpreted to require the categorical approach. It amended §924(c) specifically to abrogate the *results* of those deci-

Opinion of the Court

sions, without making any attempt to overturn the categorical *reading* on which they were based. And *that* would have been an odd way of proceeding if Congress had thought the categorical reading erroneous.

There's yet one further and distinct way in which §924(c)'s history undermines the government's case-specific reading of the residual clause. As originally enacted in 1968, §924(c) prohibited the use of a firearm in connection with *any* federal felony. §102, 82 Stat. 1224. The 1984 amendments *narrowed* §924(c) by limiting its predicate offenses to "crimes of violence." But the case-specific reading would go a long way toward nullifying that limitation and restoring the statute's original breadth. After all, how many felonies don't involve a substantial risk of physical force when they're committed using a firearm—let alone when the defendant brandishes or discharges the firearm?

Recognizing this difficulty, the government assures us that a jury wouldn't be allowed to find a felony to be a crime of violence *solely* because the defendant used a firearm, although it could consider the firearm as a "factor." Tr. of Oral Arg. 8. But the government identifies no textual basis for this rule, and exactly how it would work in practice is anyone's guess. The government says, for example, that "selling counterfeit handbags" while carrying a gun wouldn't be a crime of violence under its approach. *Id.*, at 9. But why not? Because the counterfeit-handbag trade is so inherently peaceful that there's no substantial risk of a violent confrontation with dissatisfied customers, territorial competitors, or dogged police officers? And how are jurors supposed to determine that? The defendant presumably knew the risks of his trade, and he chose to arm himself. See *United States* v. *Simms*, 914 F. 3d 229, 247–248 (CA4 2019) (en banc) (refusing to "condem[n] jurors to such an ill-defined inquiry"). Even granting the government its handbag example, we suspect

Opinion of the Court

its approach would result in the vast majority of federal felonies becoming potential predicates for §924(c) charges, contrary to the limitation Congress deliberately imposed when it restricted the statute's application to crimes of violence.

### D

With all this statutory evidence now arrayed against it, the government answers that it should prevail anyway because of the canon of constitutional avoidance. Maybe the case-specific approach doesn't represent the best reading of the statute—but, the government insists, it is our duty to adopt any "'fairly possible'" reading of a statute to save it from being held unconstitutional. Brief for United States 45.[6]

We doubt, however, the canon could play a proper role in this case even if the government's reading were "possible." True, when presented with two "fair alternatives," this Court has sometimes adopted the *narrower* construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly. *United States* v. *Rumely*, 345 U. S. 41, 45, 47 (1953); see, *e.g.*, *Skilling* v. *United States*, 561 U. S. 358, 405–406, and n. 40 (2010); *United States* v. *Lanier*, 520 U. S. 259, 265–267, and n. 6 (1997). But no one before us has identified a case in which this Court has invoked the canon to *expand* the reach of a criminal statute in order to save it. Yet that

––––––––––

[6]There are at least two different canons of construction that sometimes go by the name "constitutional avoidance." The one the government invokes here is perhaps better termed the presumption of constitutionality. Of long lineage, it holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional, see, *e.g.*, *Parsons* v. *Bedford*, 3 Pet. 433, 448–449 (1830) (Story, J.), and it is distinct from the more modern (and more debated) constitutional doubt canon, which suggests courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality, see *Rust* v. *Sullivan*, 500 U. S. 173, 190–191 (1991).

is exactly what the government seeks here. Its case-specific reading would cause §924(c)(3)(B)'s penalties to apply to conduct they have not previously been understood to reach: categorically nonviolent felonies committed in violent ways. See *Simms*, 914 F. 3d, at 256–257 (Wynn, J., concurring).[7]

Employing the avoidance canon to expand a criminal statute's scope would risk offending the very same due process and separation-of-powers principles on which the vagueness doctrine itself rests. See *supra*, at 4–5. Everyone agrees that Mr. Davis and Mr. Glover did many things that Congress had declared to be crimes; and no matter how we rule today, they will face substantial prison sentences for those offenses. But does §924(c)(3)(B) require them to suffer additional punishment, on top of everything else? Even if you think it's *possible* to read the statute to impose such additional punishment, it's *impossible* to say that Congress surely intended that result, or that the law gave Mr. Davis and Mr. Glover fair warning that §924(c)'s mandatory penalties would apply to their conduct. Respect for due process and the separation of powers suggests a court may not, in order to save Congress the trou-

———————

[7]The government claims to have found cases invoking the canon to expand a statute's reach, but none actually stands for that proposition. Each simply remarks in passing that a construction the Court arrived at for other reasons had the additional benefit of avoiding vagueness concerns; none suggests that a narrower construction was available. See *United States* v. *Grace*, 461 U. S. 171, 176 (1983) (accepting government's construction, which was "not contested by appellees"); *United States* v. *Culbert*, 435 U. S. 371, 379 (1978) (finding statute clear and refusing to "manufacture ambiguity where none exists"); *United States* v. *Shreveport Grain & Elevator Co.*, 287 U. S. 77, 82–83 (1932) (finding statute unambiguous and construing it according to "the natural import of its terms"). And the dissent, despite compiling a page-long list of constitutional avoidance cases spanning "more than 200 years," *post*, at 25–26, has been unable to find any better examples. See *post*, at 29–30 (opinion of KAVANAUGH, J.).

ble of having to write a new law, construe a criminal statute to penalize conduct it does not clearly proscribe.

Employing the canon as the government wishes would also sit uneasily with the rule of lenity's teaching that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor. That rule is "perhaps not much less old than" the task of statutory "construction itself." *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820) (Marshall, C. J.). And much like the vagueness doctrine, it is founded on "the tenderness of the law for the rights of individuals" to fair notice of the law "and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department." *Ibid.*; see *Lanier*, 520 U. S., at 265–266, and n. 5. Applying constitutional avoidance to narrow a criminal statute, as this Court has historically done, accords with the rule of lenity. By contrast, using the avoidance canon instead to adopt a more expansive reading of a criminal statute would place these traditionally sympathetic doctrines at war with one another.[8]

## IV

What does the dissent have to say about all this? It starts by emphasizing that §924(c)(3)(B) has been used in "tens of thousands of federal prosecutions" since its enactment 33 years ago. *Post*, at 2 (opinion of KAVANAUGH, J.). And the dissent finds it "surprising" and "extraordinary" that, after all those prosecutions over all that time,

––––––––

[8] Admittedly, abandoning the categorical approach in favor of the case-specific approach would also have the effect of excluding from the statute's coverage defendants who commit categorically *violent* felonies in *nonviolent* ways, and in that respect would be more "lenient" for some defendants. Regardless, the constitutional principles underlying the rule of lenity counsel caution before invoking constitutional avoidance to construe the statute to punish conduct that it does not unambiguously proscribe.

Opinion of the Court

the statute could "suddenly" be deemed unconstitutional.
*Post*, at 2–3.    But the government *concedes* that
§924(c)(3)(B) is unconstitutional if it means what everyone
has understood it to mean in nearly all of those prosecu-
tions over all those years.  So the only way the statute can
be saved is if we were "suddenly" to give it a new meaning
different from the one it has borne for the last three dec-
ades.  And if we could do *that*, it would indeed be "surpris-
ing" and "extraordinary."

The dissent defends giving this old law a new meaning
by appealing to intuition.  It suggests that a categorical
reading of §924(c)(3)(B) is "unnatural" because "[i]f you
were to ask John Q. Public whether a particular crime
posed a substantial risk of violence, surely he would re-
spond, 'Well, tell me how it went down—*what happened*?'"
*Post*, at 13 (some internal quotation marks omitted).
Maybe so.  But the language in the statute before us isn't
the language posited in the dissent's push poll.  Section
924(c)(3)(B) doesn't ask about the risk that "a particular
crime posed" but about the risk that an "offense . . . by its
nature, involves."  And a categorical reading of this cate-
gorical language seemed anything but "unnatural" to the
unanimous Court in *Leocal* or the plurality in *Dimaya*.[9]
Nor did the government think the categorical reading of
§924(c)(3)(B) "unnatural" when it embraced that reading
for decades.  The dissent asks us to overlook the govern-
ment's prior view, explaining that the government only
defended a categorical reading of the statute "when it did
not matter for constitutional vagueness purposes"—that
is, before *Johnson* and *Dimaya* identified constitutional
problems with the categorical approach.  *Post*, at 34.  But

―――――――

[9]To be sure, the dissent suggests that *Leocal* and *Dimaya* adopted a
categorical reading simply to avoid practical and constitutional prob-
lems.  *Post*, at 15–16, 23, and n. 23.  But, as we have seen, this too is
mistaken.  *Leocal* did not even mention those problems, and *Dimaya*
held that the text demanded a categorical approach.  See *supra*, at 9.

Opinion of the Court

isn't that exactly the point?  Isn't it at least a little reveal-
ing that, when the government had no motive to concoct
an alternative reading, even it thought the best reading of
§924(c)(3)(B) demanded a categorical analysis?

If this line of attack won't work, the dissent tries another
by telling us that we have "not fully account[ed] for the
long tradition of substantial-risk criminal statutes."  *Post*,
at 34.  The dissent proceeds to offer a lengthy bill of par-
ticulars, citing dozens of state and federal laws that do not
use the categorical approach.  *Post*, at 7–10, and nn. 4–17.
But what does this prove?  Most of the statutes the dissent
cites impose penalties on whoever "creates," or "engages in
conduct that creates," or acts under "circumstances that
create" a substantial risk of harm; others employ similar
language.  Not a single one imposes penalties for commit-
ting certain acts during "an offense . . . that by its nature,
involves" a substantial risk, or anything similar.  March-
ing through the dissent's own catalog thus only winds up
confirming that legislatures know how to write risk-based
statutes that require a case-specific analysis—and that
§924(c)(3)(B) is not a statute like that.

When the dissent finally turns to address the words
Congress actually wrote in §924(c)(3)(B), its main argu-
ment seems to be that a categorical reading violates the
canon against superfluity.  On this account, reading "of-
fense" generically in connection with the residual clause
makes the residual clause "duplicate" the elements clause
and leaves it with "virtually nothing" to do.  *Post*, at 20.
But that is a surprising assertion coming from the dissent,
which devotes several pages to describing the "many"
offenders who have been convicted under the residual
clause using the categorical approach but who "might not"
be prosecutable under the elements clause.  *Post*, at 30–33.
It is also wrong.  As this Court has long understood, the
residual clause, read categorically, "sweeps more broadly"
than the elements clause—potentially reaching offenses,

Opinion of the Court

like burglary, that do not have violence as an *element* but that arguably create a substantial *risk* of violence. *Leocal*, 543 U. S., at 10. So even under the categorical reading, the residual clause is far from superfluous.

Without its misplaced reliance on the superfluity canon, there is little left of the dissent's textual analysis. The dissent asserts that the phrase "by its nature" must "focu[s] on the defendant's actual conduct"—but only because this "follows" from the dissent's earlier (and mistaken) superfluity argument. *Post*, at 21. Next, the dissent claims that "the word 'involves'" and "the phrase 'in the course of committing the offense'" both support a case-specific approach. *Post*, at 22. But these words do not favor either reading: It is just as natural to ask whether the offense of robbery *ordinarily* "involves" a substantial risk that violence will be used "in the course of committing the offense" as it is to ask whether a *particular* robbery "involved" a substantial risk that violence would be used "in the course of committing the offense." If anything, the statute's use of the present and not the past tense lends further support to the categorical reading.[10] The dissent thinks it significant, too, that the statute before us "does not use the term 'conviction,'" *post*, at 23; but that word is hardly a prerequisite for the categorical approach, as *Dimaya* makes clear. Remarkably, the dissent has noth-

———————

[10] The dissent claims that *Taylor* v. *United States*, 495 U. S. 575 (1990), and *Nijhawan* v. *Holder*, 557 U. S. 29 (2009), pointed to "the *absence* of the word 'involved'" as one reason to adopt a categorical approach. *Post*, at 22. Not true. *Taylor* explained that the ACCA's elements clause requires a categorical approach in part because it refers to a crime "that 'has as an element'—not any crime that, in a particular case, involves—the use or threat of force." 495 U. S., at 600. All the work in that sentence was being done by the phrase "in a particular case," not by the word "involves." And *Nijhawan* noted that the Court had construed the ACCA's residual clause, which refers to crimes "that '*involv[e] conduct* that presents a serious potential risk of physical injury," to require the categorical approach. 557 U. S., at 36.

ing at all to say about §924(c)(3)'s history or its relation-
ship with other criminal statutes; it just ignores those
arguments. And when it comes to the constitutional
avoidance canon, the dissent does not even try to explain
how using that canon to criminalize conduct that *isn't*
criminal under the fairest reading of a statute might be
reconciled with traditional principles of fair notice and
separation of powers. Instead, the dissent seems willing
to consign "'thousands'" of defendants to prison for
"years—potentially decades," not because it is certain or
even likely that Congress ordained those penalties, but
because it is merely "possible" Congress might have done
so. *Post*, at 30, 33–34. In our republic, a speculative
possibility that a man's conduct violated the law should
never be enough to justify taking his liberty.

In the end, the dissent is forced to argue that holding
§924(c)(3)(B) unconstitutional would invite "bad" social
policy consequences. *Post*, at 34. In fact, the dissent's
legal analysis only comes sandwiched between a lengthy
paean to laws that impose severe punishments for gun
crimes and a rogue's gallery of offenses that may now be
punished somewhat less severely. See *post*, at 1–2, 30–34.
The dissent acknowledges that "the consequences cannot
change our understanding of the law." *Post*, at 34. But
what's the point of all this talk of "bad" consequences if
not to suggest that judges should be tempted into reading
the law to satisfy their policy goals? Even taken on their
own terms, too, the dissent's policy concerns are consider-
ably overblown. While the dissent worries that our ruling
may elicit challenges to past §924(c) convictions, *post*, at
33, the dissent's preferred approach—saving §924(c)(3)(B)
by changing its meaning—would also call into question
countless convictions premised on the categorical reading.
And defendants whose §924(c) convictions are overturned
by virtue of today's ruling will not even necessarily receive
lighter sentences: As this Court has noted, when a defend-

Opinion of the Court

ant's §924(c) conviction is invalidated, courts of appeals "routinely" vacate the defendant's entire sentence on all counts "so that the district court may increase the sentences for any remaining counts" if such an increase is warranted. *Dean* v. *United States*, 581 U. S. ___, ___ (2017) (slip op., at 5).

Of course, too, Congress always remains free to adopt a case-specific approach to defining crimes of violence for purposes of §924(c)(3)(B) going forward. As Mr. Davis and Mr. Glover point out, one easy way of achieving that goal would be to amend the statute so it covers any felony that, "based on the facts underlying the offense, involved a substantial risk" that physical force against the person or property of another would be used in the course of committing the offense. Brief for Respondents 46 (quoting H. R. 7113, 115th Cong., 2d Sess. (2018); emphasis deleted); see also Tr. of Oral Arg. 19 (government's counsel agreeing that this language would offer "clearer" support for the case-specific approach than the current version of the statute does). The dissent's catalog of case-specific, risk-based criminal statutes supplies plenty of other models Congress could follow. Alternatively still, Congress might choose to retain the categorical approach but avoid vagueness in other ways, such as by defining crimes of violence to include certain enumerated offenses or offenses that carry certain minimum penalties. All these options and more are on the table. But these are options that belong to Congress to consider; no matter how tempting, this Court is not in the business of writing new statutes to right every social wrong it may perceive.

\*

We agree with the court of appeals' conclusion that §924(c)(3)(B) is unconstitutionally vague. At the same time, exactly what that holding means for Mr. Davis and Mr. Glover remains to be determined. After the Fifth

Opinion of the Court

Circuit vacated their convictions and sentences on one of the two §924(c) counts at issue, both men sought rehearing and argued that the court should have vacated their sentences on all counts.  In response, the government conceded that, if §924(c)(3)(B) is held to be vague, then the defendants are entitled to a full resentencing, not just the more limited remedy the court had granted them.  The Fifth Circuit has deferred ruling on the rehearing petitions pending our decision, so we remand the case to allow the court to address those petitions.  The judgment below is affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

KAVANAUGH, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 18–431

————

## UNITED STATES, PETITIONER *v.* MAURICE LAMONT DAVIS AND ANDRE LEVON GLOVER

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2019]

JUSTICE KAVANAUGH, with whom JUSTICE THOMAS and JUSTICE ALITO join, and with whom THE CHIEF JUSTICE joins as to all but Part II–C, dissenting.

Crime and firearms form a dangerous mix. From the 1960s through the 1980s, violent gun crime was rampant in America. The wave of violence destroyed lives and devastated communities, particularly in America's cities. Between 1963 and 1968, annual murders with firearms rose by a staggering 87 percent, and annual aggravated assaults with firearms increased by more than 230 percent.

Faced with an onslaught of violent gun crime and its debilitating effects, the American people demanded action. In 1968, Congress passed and President Lyndon Johnson signed the Gun Control Act. That law made it a separate federal crime to use or carry a firearm during a federal felony. Despite that and other efforts, violent crime with firearms continued at extraordinarily dangerous levels. In 1984 and again in 1986, in legislation signed by President Reagan, Congress reenacted that provision of the 1968 Act, with amendments. The law now prohibits, among other things, using or carrying a firearm during and in relation to a federal "crime of violence." 18 U. S. C. §924(c)(1)(A). The law mandates substantial prison time for violators.

Kavanaugh, J., dissenting

Over the last 33 years, tens of thousands of §924(c) cases have been prosecuted in the federal courts. Meanwhile, violent crime with firearms has decreased significantly. Over the last 25 years, the annual rate of murders with firearms has dropped by about 50 percent, and the annual rate of nonfatal violent crimes (robberies, aggravated assaults, and sex crimes) with firearms has decreased by about 75 percent. Violent crime in general (committed with or without a firearm) has also declined. During that same time period, both the annual rate of overall violent crime and the annual rate of murders have dropped by almost 50 percent.

Although the level of violent crime in America is still very high, especially in certain cities, Americans under the age of 40 probably cannot fully appreciate how much safer most American cities and towns are now than they were in the 1960s, 1970s, and 1980s. Many factors have contributed to the decline of violent crime in America. But one cannot dismiss the effects of state and federal laws that impose steep punishments on those who commit violent crimes with firearms.

Yet today, after 33 years and tens of thousands of federal prosecutions, the Court suddenly finds a key provision of §924(c) to be unconstitutional because it is supposedly too vague. That is a surprising conclusion for the Court to reach about a federal law that has been applied so often for so long with so little problem. The Court's decision today will make it harder to prosecute violent gun crimes in the future. The Court's decision also will likely mean that thousands of inmates who committed violent gun crimes will be released far earlier than Congress specified when enacting §924(c). The inmates who will be released early are not nonviolent offenders. They are not drug offenders. They are offenders who committed violent crimes with firearms, often brutally violent crimes.

A decision to strike down a 33-year-old, often-prosecuted

KAVANAUGH, J., dissenting

federal criminal law because it is all of a sudden unconstitutionally vague is an extraordinary event in this Court. The Constitution's separation of powers authorizes this Court to declare Acts of Congress unconstitutional. That is an awesome power. We exercise that power of judicial review in justiciable cases to, among other things, ensure that Congress acts within constitutional limits and abides by the separation of powers. But when we overstep our role in the name of enforcing limits on Congress, we do not uphold the separation of powers, we transgress the separation of powers.

I fully understand how the Court has arrived at its conclusion given the Court's recent precedents in *Johnson* v. *United States*, 576 U. S. ___ (2015), and *Sessions* v. *Dimaya*, 584 U. S. ___ (2018). But this case presents an entirely different question. Those cases involved statutes that imposed additional penalties based on *prior* convictions. This case involves a statute that focuses on the defendant's current conduct during the charged crime. The statute here operates entirely in the present. Under our precedents, this statute therefore is not unconstitutionally vague. It is a serious mistake, in my respectful view, to follow *Johnson* and *Dimaya* off the constitutional cliff in this case. I respectfully dissent.[1]

## I

Section 924(c) prohibits using or carrying a firearm during and in relation to a federal "crime of violence," or

---

[1] The statistics contained in the introduction are drawn from: Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reports 6–7, 8–9 (1963) (rise in violent crime with firearms in the 1960s); *id.*, at 1, 6–7, 9 (1968) (same); Pew Research Center, Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware 6, n. 5, and 36, 50 (2013) (decrease in violent crime with firearms over about the past 25 years); N. James, Congressional Research Service, Recent Violent Crime Trends in the United States 25–26 (Rep. No. R45236) (June 20, 2018) (decrease in violent crime over about the past 25 years).

4                 UNITED STATES *v.* DAVIS

KAVANAUGH, J., dissenting

possessing a firearm in furtherance of a federal "crime of
violence."[2]   Section 924(c) is a substantive criminal of-
fense, not a sentence enhancement.   The Government
therefore charges a §924(c) offense in the indictment.
Ordinarily, when charged under §924(c), a defendant will
be charged with both an underlying federal crime and
then also a §924(c) offense.   For example, Davis was
charged with both conspiracy to commit robbery and a
§924(c) offense.   Glover was likewise charged with both
conspiracy to commit robbery and a §924(c) offense.

By any measure, Davis and Glover's conduct during the
conspiracy was violent.   Davis and Glover committed
multiple armed robberies of convenience stores in the
early morning hours.   Those armed robberies followed a
pattern:  Davis and Glover (or Glover and a co-
conspirator)—usually covering their faces—would arrive
at a convenience store in the early morning hours in a car
with no plates.   One of them would point a short-barreled
shotgun at a female employee and order her around.
Sometimes, he would point the short-barreled shotgun in
her face.   Sometimes, he would put the short-barreled

_____

[2] Section 924(c)(1)(A) provides: "Except to the extent that a greater
minimum sentence is otherwise provided by this subsection or by any
other provision of law, any person who, during and in relation to any
crime of violence or drug trafficking crime (including a crime of violence
or drug trafficking crime that provides for an enhanced punishment if
committed by the use of a deadly or dangerous weapon or device) for
which the person may be prosecuted in a court of the United States,
uses or carries a firearm, or who, in furtherance of any such crime,
possesses a firearm, shall, in addition to the punishment provided for
such crime of violence or drug trafficking crime—(i) be sentenced to a
term of imprisonment of not less than 5 years; (ii) if the firearm is
brandished, be sentenced to a term of imprisonment of not less than 7
years; and (iii) if the firearm is discharged, be sentenced to a term of
imprisonment of not less than 10 years."   Section 924(c)(1)(B) imposes
heightened penalties for certain types of firearms and firearm devices,
and §924(c)(1)(C) imposes heightened penalties for subsequent §924(c)
convictions.

KAVANAUGH, J., dissenting

shotgun in her side. While one of them was aiming the short-barreled shotgun at the store employee, another would take cigarettes and demand money. Davis and Glover's crime spree ended with still more dangerous behavior: a high-speed car chase in wet and dangerous driving conditions that culminated in a crash.

Section 924(c)(3) lays out the definition of "crime of violence" for purposes of §924(c). That definition has two prongs, either of which can bring a defendant within the scope of §924(c).[3]

The first prong of §924(c)(3) is the elements prong. That prong, the Government concedes here, asks whether the underlying crime *categorically* fits within §924(c) because of the elements of the crime. The judge makes that determination. If the answer is yes, then the judge instructs the jury on the §924(c) offense to simply find whether the defendant used or carried a firearm during and in relation to that underlying crime, or possessed a firearm in furtherance of that underlying crime.

The Fifth Circuit concluded that Davis and Glover's conspiracy offenses did not fit within the elements prong of §924(c)(3). So the question was whether Davis and Glover were covered by the second prong.

The second prong of §924(c)(3) is the substantial-risk prong. That prong covers cases beyond those covered by the first prong, the elements prong. Congress sensibly wanted to cover defendants who committed crimes that are not necessarily violent by definition under the elements prong, but who committed crimes with firearms in a

---

[3] Section 924(c)(3) provides: "For purposes of this subsection the term 'crime of violence' means an offense that is a felony and—(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

way that created a substantial risk that violent force would be used. To that end, the substantial-risk prong, properly read, focuses not on the elements of the underlying crime, but rather on the defendant's conduct during that crime. If a defendant used or carried a firearm during and in relation to the crime, *and* the defendant's conduct during the crime created a substantial risk that physical force may be used, then the defendant may be guilty of a §924(c) offense. In that instance, the jury makes the finding: Did the defendant's conduct during the underlying crime create a substantial risk that violent force would be used?

In other words, as relevant here, a defendant can fall within the scope of §924(c) either (1) because of the elements of the underlying crime or (2) because of the defendant's conduct in committing the underlying crime. Either (1) the judge finds that an element of the underlying crime entails the use of physical force or (2) the jury finds that the defendant's actual conduct involved a substantial risk that physical force may be used. Put another way, the underlying crime itself may automatically bring the defendant within the scope of §924(c). Or if the underlying crime does not automatically qualify as a crime of violence, then the defendant's conduct during the crime may still bring the defendant within the scope of §924(c). Sensible enough.

The basic question in this case is whether the substantial-risk prong of §924(c)(3)'s definition of "crime of violence" is unconstitutionally vague. It is not.

As this Court has explained multiple times, criminal laws that apply a risk standard to a defendant's conduct are not too vague, but instead are perfectly constitutional. Writing for the Court in *Johnson*, for example, Justice Scalia stated that "we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." 576

U. S., at ___ (slip op., at 12). The following year in *Welch* v. *United States*, Justice Kennedy confirmed that *Johnson* "cast no doubt on the many laws that 'require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*.'" 578 U. S. ___, ___–___ (2016) (slip op., at 3–4) (quoting *Johnson*, 576 U. S., at ___ (slip op., at 12)). Two years later in *Dimaya*, JUSTICE KAGAN wrote for the Court and echoed Justice Scalia and Justice Kennedy: "In *Johnson*'s words, 'we do not doubt' the constitutionality of applying §16(b)'s 'substantial risk [standard] to real-world conduct.'" 584 U. S., at ___–___ (slip op., at 10–11) (quoting *Johnson*, 576 U. S., at ___ (slip op., at 12)).

That kind of risk-based criminal statute is not only constitutional, it is very common. As the Court has recognized, "dozens of federal and state criminal laws use terms like 'substantial risk,' 'grave risk,' and 'unreasonable risk,'" and almost all of those statutes "require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*." *Johnson*, 576 U. S., at ___ (slip op., at 12). Indeed, the Government's brief in *Johnson* collected more than 200 state and federal statutes that imposed criminal penalties for conduct that created a risk of injury to others. App. to Supp. Brief for United States in *Johnson* v. *United States*, O. T. 2014, No. 13–7120, pp. 1a–99a.

Take a few examples from federal law: It is a federal crime to create "a *substantial risk* of harm to human life" while illegally "manufacturing a controlled substance." 21 U. S. C. §858 (emphasis added). Under certain circumstances, it is a federal crime to create "a *substantial risk* of serious bodily injury to any other person by destroying or damaging any structure, conveyance, or other real or personal property within the United States or by attempting or conspiring to" do so. 18 U. S. C. §2332b(a)(1)(B) (emphasis added). And for purposes of the chapter of the

KAVANAUGH, J., dissenting

federal criminal code dealing with sexual abuse crimes, "serious bodily injury" is defined as "bodily injury that involves a *substantial risk* of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." §2246(4) (emphasis added).

The States' criminal codes are similar. Among the crimes that the States define by using qualitative risk standards are resisting arrest,[4] kidnaping,[5] assault,[6] battery,[7] criminal recklessness,[8] endangerment,[9] unlawful

---

[4] See, *e.g.*, Colo. Rev. Stat. §18–8–103(1)(b) (2018) ("substantial risk of causing bodily injury"); Ind. Code §35–44.1–3–1(b)(1)(B) (2019) ("substantial risk of bodily injury"); Mo. Rev. Stat. §575.150 (2016) ("substantial risk of serious physical injury or death"); Neb. Rev. Stat. §28–904(1)(b) (2016) ("substantial risk of causing physical injury"); Ore. Rev. Stat. §162.315(2)(c) (2017) ("substantial risk of physical injury").

[5] See, *e.g.*, Alaska Stat. §11.41.300(a)(2)(B) (2018) ("substantial risk of serious physical injury"); Ohio Rev. Code Ann. §2905.01(B) (Lexis Supp. 2019) ("substantial risk of serious physical harm").

[6] See, *e.g.*, Ala. Code §13A–6–20(a)(3) (2015) ("grave risk of death"); Del. Code Ann., Tit. 11, §613(a)(3) (2015) ("substantial risk of death"); D. C. Code §22–404.01(a)(2) (2018 Cum. Supp.) ("grave risk of serious bodily injury"); Mo. Rev. Stat. §565.056(1)(4) (2016) ("substantial risk of death or serious physical injury"); Utah Code §76–5–102(1)(b) (2017) ("substantial risk of bodily injury").

[7] See, *e.g.*, Ind. Code §35–42–2–1.5 (Supp. 2018) ("substantial risk of death"); Wis. Stat. §940.19(6) (2016) ("substantial risk of great bodily harm").

[8] See, *e.g.*, Me. Rev. Stat. Ann., Tit. 17–A, §211(1) (2006) ("substantial risk of serious bodily injury"), §213(1) (same); Okla. Stat., Tit. 21, §1289.11 (2011) ("unreasonable risk and probability of death or great bodily harm"); Wis. Stat. Ann. §939.24(1) (2016) ("unreasonable and substantial risk of death or great bodily harm").

[9] See, *e.g.*, Ariz. Rev. Stat. Ann. §§13–1201(A), (B) (2010) ("substantial risk of imminent death or physical injury" and "substantial risk of imminent death"); N. D. Cent. Code Ann. §12.1–17–03 (2012) ("substantial risk of serious bodily injury or death"); Ore. Rev. Stat. §163.195(1) (2017) ("substantial risk of serious physical injury"); Wash. Rev. Code §9A.36.050(1) (2018) ("substantial risk of death or serious physical

restraint,[10] theft,[11] hazing,[12] abuse,[13] neglect,[14] arson,[15] homicide,[16] and weapons offenses.[17]

—————

injury").

[10] See, *e.g.*, Ark. Code §5–11–103(a) (2013) ("substantial risk of serious physical injury"); Conn. Gen. Stat. §53a–95(a) (2017) ("substantial risk of physical injury"); Tex. Penal Code Ann. §20.02(c)(2)(A) (2019) ("substantial risk of serious bodily injury").

[11] See, *e.g.*, Ind. Code §35–43–4–2(a)(2)(B) (2018) ("substantial risk of bodily injury"); Minn. Stat. §609.52(3a) (2016) ("reasonably foreseeable risk of bodily harm").

[12] See, *e.g.*, Ind. Code §35–42–2–2.5(a) (2018) ("substantial risk of bodily injury"); Miss. Code. Ann. §§97–3–105(1), (3) (2014) ("substantial risk of physical injury"); Mo. Rev. Stat. §§578.365(1), (5) (2016) ("probable risk of the loss of life or probable bodily or psychological harm" and "substantial risk to the life of the student or prospective member"); Ohio Rev. Code Ann. §2903.31(A) (Lexis 2014) ("substantial risk of causing mental or physical harm"); Ore. Rev. Stat. §§163.197(4)(a)(B), (C) (2017) ("unreasonable risk of harm").

[13] See, *e.g.*, Iowa Code §709.3(1)(a) (2019) ("substantial risk of death or serious injury"); N. C. Gen. Stat. Ann. §14–318.2(a) (2017) ("substantial risk of physical injury"); W. Va. Code Ann. §§61–8D–3(c), (d)(1) (2014) ("substantial risk of death or serious bodily injury" and "substantial risk of bodily injury"); Wis. Stat. §§948.03(1), (4)(a), (b) (2016) ("unreasonable risk of harm," "unreasonable risk of great bodily harm," and "unreasonable risk of bodily harm").

[14] See, *e.g.*, Fla. Stat. §825.102(3)(a) (2018) ("substantial risk of death"), §827.03(1)(e) (same); W. Va. Code Ann. §§61–8D–4(c), (d)(1) (2014) ("substantial risk of death or serious bodily injury" and "substantial risk of bodily injury").

[15] See, *e.g.*, Kan. Stat. Ann. §§21–5812(c)(2)(A)(i), (ii) (2018 Cum. Supp.) ("substantial risk of bodily harm"); R. I. Gen. Laws §11–4–2 (2002) ("substantial risk of serious physical harm"); Wis. Stat. §§941.11(1), (2) (2016) ("unreasonable risk of death or great bodily harm").

[16] See, *e.g.*, Ala. Code §13A–6–2(a)(2) (2015) ("grave risk of death"); Kan. Stat. Ann. §21–5406(a) (2018 Cum. Supp.) ("unreasonable risk of injury"); N. Y. Penal Law Ann. §125.20(4) (West 2009) ("grave risk of serious physical injury"), §§125.25(2), (4) ("grave risk of death" and "grave risk of serious physical injury or death").

[17] See, *e.g.*, Alaska Stat. §11.61.190(a)(2) (2018) ("substantial and unjustifiable risk of physical injury"); Ark. Code Ann. §5–74–107(b)(1) (Supp. 2017) ("substantial risk of physical injury"); Ohio Rev. Code

10                       UNITED STATES *v.* DAVIS

                        KAVANAUGH, J., dissenting

Consider a few specific examples: In Pennsylvania, a person resists arrest "if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a *substantial risk* of bodily injury to the public servant or anyone else." 18 Pa. Cons. Stat. §5104 (2015) (emphasis added). In Tennessee, kidnaping is defined as false imprisonment "under circumstances exposing the other person to *substantial risk* of bodily injury." Tenn. Code Ann. §39–13–303(a) (2018) (emphasis added). In New York, reckless endangerment occurs when a person "recklessly engages in conduct which creates a *substantial risk* of serious physical injury to another person." N. Y. Penal Law Ann. §120.20 (emphasis added). And in Maryland, neglect of a minor is defined as "the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a *substantial risk* of harm to the minor's physical health or a *substantial risk* of mental injury to the minor." Md. Crim. Law Code Ann. §3–602.1(a)(5)(i) (2012) (emphasis added).

The above examples demonstrate that substantial-risk standards like the one in §924(c)(3)(B) are a traditional and common feature of criminal statutes. As the Eleventh Circuit succinctly stated, there "is nothing remarkable about asking jurors to make that sort of risk determination—and, if necessary, requiring judges to instruct jurors on the meaning of terms like 'substantial' and 'physical force.'" *Ovalles* v. *United States*, 905 F. 3d 1231, 1250, n. 8 (2018) (en banc). That is "exactly how similar questions have been resolved for centuries and are resolved every day in courts throughout the country." *Ibid.*

––––––––––

Ann. §2923.162(C)(2) (Lexis 2014) ("substantial risk of physical harm"); R. I. Gen. Laws §11–47–61 (2002) ("substantial risk of death or serious injury"); Wash. Rev. Code §9A.36.045(1) (2018) ("substantial risk of death or serious physical injury"); W. Va. Code Ann. §61–7–12 (2014) ("substantial risk of death or serious bodily injury").

KAVANAUGH, J., dissenting

A statute is unconstitutionally vague only if "it fails to give ordinary people fair notice of the conduct it punishes," or is "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U. S., at ___ (slip op., at 3). Section 924(c)(3)(B) is not unconstitutionally vague. To reiterate, §924(c)(3)(B) defines "crime of violence" as "an offense that is a felony and . . . that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Section 924(c)(3)(B) affords people of ordinary intelligence ample notice that they may be punished if they carry or use a gun while engaging in criminal conduct that presents a risk that physical force may be used. There "is a whole range of conduct that anyone with at least a semblance of common sense would know" is covered by §924(c)(3)(B). *Chicago* v. *Morales*, 527 U. S. 41, 114 (1999) (THOMAS, J., dissenting) (internal quotation marks omitted). And prosecutors, defense attorneys, judges, and juries are well equipped to enforce and defend §924(c)(3)(B) prosecutions in a principled and predictable way—just as they have for decades with many other substantial-risk criminal statutes. As Judge Niemeyer wrote in his separate opinion in the Fourth Circuit, "the parties in those cases had little difficulty understanding, enforcing, or defending the §924(c)(1) charges at issue." *United States* v. *Simms*, 914 F. 3d 229, 264 (2019).[18]

In short, §924(c)(3)(B) is a garden-variety, substantial-risk criminal law. Section 924(c)(3)(B) is not unconstitutionally vague.

## II

This case therefore should be straightforward. But the Court complicates things by engaging in a two-step dance

—————

[18]Judge Niemeyer's opinion was joined by Judges Wilkinson, Duncan, Agee, Keenan, and Quattlebaum.

that ends with the Court concluding that §924(c)(3)(B) is unconstitutionally vague.

The Court's first step is to construe §924(c)(3)'s substantial-risk prong to require an ordinary-case categorical approach rather than a conduct-specific approach. In other words, the Court says that a defendant's guilt or innocence under §924(c)(3)'s substantial-risk prong hinges on a judge's assessment of how a *hypothetical defendant* would ordinarily commit the underlying crime. In the Court's view, a defendant's guilt or innocence under §924(c)(3)'s substantial-risk prong does not depend on a jury's finding about how the *actual defendant* actually committed the underlying crime.

The Court's second step is based on the Court's decisions in *Johnson* and *Dimaya.* The Court says that the ordinary-case categorical approach makes §924(c)(3)(B) unconstitutionally vague.

For purposes of this case, the Court's error is its first step—that is, in construing the substantial-risk prong of §924(c)(3) to require an ordinary-case categorical approach. For three reasons, I disagree with the Court's analysis. First, the Court's justifications in *Johnson* and *Dimaya* for adopting the categorical approach do not apply in the context of §924(c). Second, the text of §924(c)(3)(B) is best read to focus on the actual defendant's actual conduct during the underlying crime, not on a hypothetical defendant's imagined conduct during an ordinary case of the underlying crime. Third, even if the text were ambiguous, the constitutional avoidance canon requires that we interpret the statute to focus on the actual defendant's actual conduct.

I will address those three points in Parts II–A, II–B, and II–C.

A

According to the Court, if §924(c)(3)(B) focused on the

defendant's conduct during the underlying crime, then it would *not* be unconstitutionally vague. But §924(c)(3)(B), as the Court reads it, focuses on a hypothetical defendant's conduct during an ordinary case of the underlying crime. As a result, the Court says that §924(c)(3)(B) *is* unconstitutionally vague.

But it makes little sense, as I see it, to say that §924(c)(3)(B)'s substantial-risk inquiry focuses on whether *a hypothetical defendant's imagined conduct* during an ordinary case of the crime creates a substantial risk that physical force may be used, rather than on whether *the actual defendant's actual conduct* during the actual crime created a substantial risk that physical force may be used. Why would we interpret a federal law that criminalizes current-offense conduct to focus on a hypothetical defendant rather than on the actual defendant? As Judge Newsom cogently wrote for the Eleventh Circuit en banc majority, "If you were to ask John Q. Public whether a particular crime posed a substantial risk of violence, surely he would respond, 'Well, tell me how it went down—*what happened*?'" *Ovalles*, 905 F. 3d, at 1241.[19]

Why does the Court read the substantial-risk prong in such an unnatural way? The Court explains that *Johnson* interpreted similar substantial-risk language to require the ordinary-case categorical approach. See 576 U. S., at ___–___ (slip op., at 12–13). A plurality of the Court did the same in *Dimaya*. See 584 U. S., at ___–___ (slip op., at 12–15). And the Court today casts this case as the third installment in a trilogy with a predictable ending, one that was supposedly foreordained by *Johnson* and *Dimaya*.

The gaping hole in the Court's analysis, in my view, is that *Johnson* and *Dimaya* addressed statutes that im-

––––––––––

[19] Judge Newsom's majority opinion was joined by Chief Judge Ed Carnes and Judges Tjoflat, Marcus, William Pryor, Rosenbaum, Branch, and Hull.

14            UNITED STATES *v.* DAVIS

KAVANAUGH, J., dissenting

posed penalties based on a defendant's *prior* criminal convictions.

In *Johnson*, the Court interpreted a definition of "violent felony" that was used in sentencing proceedings to classify prior convictions as predicates for stricter sentences. See §§924(e)(1), (e)(2)(B). In *Dimaya*, the Court interpreted a definition of "crime of violence" that was used in immigration proceedings to classify prior convictions as predicates for more severe immigration consequences. See §16 (defining "crime of violence"); 8 U. S. C. §1101(a)(43)(F) (incorporating 18 U. S. C. §16); 8 U. S. C. §1227(a)(2)(A)(iii) (deportation); §§1229b(a)(3), (b)(1)(C) (ineligibility for cancellation of removal and adjustment of status).

In interpreting those statutes, the Court employed the ordinary-case categorical approach to assess an individual's *past* convictions. And application of that categorical approach, the Court then said, rendered the statutes at issue in those cases unconstitutionally vague. See *Dimaya*, 584 U. S., at ___–___ (slip op., at 9–11); *Johnson*, 576 U. S., at ___–___ (slip op., at 5–6).[20]

Two important principles drove the Court's adoption of the categorical approach in the *prior*-conviction context in *Johnson* and *Dimaya*.

*First*, in the prior-conviction cases, the Court emphasized that the categorical approach avoids the difficulties and inequities of relitigating "past convictions in minitrials conducted long after the fact." *Moncrieffe* v. *Holder*, 569 U. S. 184, 200–201 (2013). Without the categorical approach, courts would have to determine the underlying

───────────

[20]Tellingly, the Government in *Johnson* and *Dimaya* did not dispute that the categorical approach was the proper method of interpreting the statutes at issue. See *Sessions* v. *Dimaya*, 584 U. S. ___, ___ (2018) (plurality opinion) (slip op., at 13); *Johnson* v. *United States*, 576 U. S. ___, ___ (2015) (slip op., at 13). In this case, the Government strenuously disputes the applicability of the categorical approach precisely because the inquiry is not about past convictions.

KAVANAUGH, J., dissenting

conduct from years-old or even decades-old documents with varying levels of factual detail. See *Taylor* v. *United States*, 495 U. S. 575, 601–602 (1990). The factual statements that are contained in those documents are often "prone to error." *Mathis* v. *United States*, 579 U. S. ___, ___ (2016) (slip op., at 10). The categorical approach avoids the unfairness of allowing inaccuracies to "come back to haunt the defendant many years down the road." *Id.*, at ___ (slip op., at 11). The Court has echoed that reasoning time and again. See, *e.g.*, *Dimaya*, 584 U. S., at ___ (plurality opinion) (slip op., at 15); *Johnson*, 576 U. S., at ___ (slip op., at 13); *Descamps* v. *United States*, 570 U. S. 254, 270 (2013); *Chambers* v. *United States*, 555 U. S. 122, 125 (2009).

*Second*, in the prior-conviction cases, the Court insisted on the categorical approach to avoid "Sixth Amendment concerns." *Descamps*, 570 U. S., at 269. The Sixth Amendment, as interpreted by this Court's precedents, does not allow a judge (rather than a jury) to make factual determinations that increase the maximum penalty. See *Apprendi* v. *New Jersey*, 530 U. S. 466, 490 (2000). The Court has read its Sixth Amendment precedents to require the categorical approach. Under the categorical approach, the judge looks only to the fact of conviction and the statutory definition of the prior offense. The Court has reiterated those Sixth Amendment concerns in countless categorical-approach cases. See, *e.g.*, *Dimaya*, 584 U. S., at ___ (plurality opinion) (slip op., at 13); *Mathis*, 579 U. S., at ___ (slip op., at 10); *Shepard* v. *United States*, 544 U. S. 13, 24–25 (2005) (plurality opinion); *Taylor*, 495 U. S., at 601.

In short, the Court in *Johnson* and *Dimaya* employed something akin to the constitutional avoidance doctrine to read the statutes at issue to avoid practical and Sixth Amendment problems. In the words of JUSTICE THOMAS, the "categorical approach was never really about the best reading of the text." *Dimaya*, 584 U. S., at ___ (dissenting

KAVANAUGH, J., dissenting

opinion) (slip op., at 28). As Judge Raggi has perceptively stated: "[C]onstitutional avoidance informed the original categorical-approach mandate." *United States* v. *Barrett*, 903 F. 3d 166, 179 (CA2 2018).

But neither of the two reasons identified in *Johnson* and *Dimaya* applies to 18 U. S. C. §924(c)(3)(B)—not even a little.

*First*, §924(c) does not require examination of old conduct underlying a *prior* conviction. Section 924(c) operates entirely in the present. In a §924(c) prosecution, there are ordinarily two charged crimes: the underlying crime and the §924(c) offense. Here, for example, the defendants were charged with conspiracy to commit robbery and with the §924(c) offense. The defendant's conduct during the underlying crime is part of the §924(c) offense. The conduct charged in the §924(c) offense is in front of the jury (if the case goes to trial) or accepted by the defendant in the plea agreement (if the defendant pleads guilty). The indictment must allege specific offense conduct, and that conduct must be proved with real-world facts in order to obtain a conviction. There is no need to worry about stale evidence or unavailable witnesses. Nor is there any need to worry about inaccuracies in years-old or decades-old documents coming back to haunt the defendant.

*Second*, §924(c) likewise raises no Sixth Amendment concerns. A jury will find the facts or, if the case ends in a guilty plea, the defendant will accept the facts in the plea agreement. For the §924(c) charge, as relevant here, a jury must find that the defendant's conduct "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The defendant has the opportunity to contest the relevant facts either at the trial or in plea negotiations. No Sixth Amendment issue arises in a §924(c) prosecution.

No practical or Sixth Amendment problems exist with

§924(c)(3)(B). Indeed, the Court itself acknowledges that "a case-specific approach wouldn't yield the same practical and Sixth Amendment complications" that arose in *Johnson* and *Dimaya*. *Ante*, at 8.

We should recognize that *Johnson* and *Dimaya* dealt with an entirely different context: *prior* convictions. There is no need to follow *Johnson* and *Dimaya* off the cliff here. We should read §924(c)(3)(B) like the dozens of other substantial-risk statutes in federal and state criminal law: to focus on the actual defendant's actual conduct during the actual underlying crime, not on a hypothetical defendant's imagined conduct during an ordinary case of that crime.

### B

Now to the statutory text of §924(c)(3)(B). Even though the context here is current-offense conduct, not past convictions, the Court says that the statutory language nonetheless compels a focus on a hypothetical defendant's imagined conduct, not on the actual defendant's actual conduct. I disagree. Criminal defendants are usually punished based on what they actually did, not based on what a hypothetical defendant might have done.

To begin with, the text of §924(c)(3)(B) must be interpreted against the backdrop of traditional criminal-law practice. As described above, substantial-risk statutes are commonplace in federal and state criminal law. Those statutes ordinarily call for examination of the actual defendant's actual conduct during the actual crime. The Court does not identify a single self-contained federal or state law that defines the *actus reus* of the crime based on the imagination of the judge about a hypothetical defendant, rather than on the evidence before the jury about the actual defendant.

This Court applied an exception in *Johnson* and *Dimaya* for substantial-risk statutes that impose sentencing and

18          UNITED STATES *v.* DAVIS

other penalties based on *past* convictions.  But that is an exception for past convictions, not a rule for current-offense conduct.  Section 924(c)(3)(B) must be read in line with the traditional, common practice of focusing on the actual defendant's actual conduct during the underlying crime.

With that background, I turn to the precise text of §924(c)(3).  To repeat, the text of §924(c)(3) provides: A defendant may not use or carry a firearm during and in relation to, or possess a firearm in furtherance of, "an offense that is a felony and" that either (A) "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or (B) "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

I will focus on four particular aspects of the statutory text of §924(c)(3)(B).

*First*, start with the term "offense."  Section 924(c)(3) has two prongs under which a defendant might qualify for a §924(c) conviction: first, if the underlying crime automatically qualifies as a crime of violence based on its elements; and, second, if the defendant's conduct during the underlying crime created a substantial risk that physical force may be used, even if the underlying crime by its elements does not constitute a crime of violence.

The term "offense" applies to both prongs.  In the elements prong, the term refers to the elements of the underlying crime.  In the substantial-risk prong, the term refers to the defendant's conduct during the underlying crime.  That is entirely commonplace and sensible.

Reading "offense" in that commonsense way follows from the Court's precedents interpreting the term "offense."  As the Court has explained many times, the term "offense" may "sometimes refer to a generic crime" and may "sometimes refer to the specific acts in which an

offender engaged on a specific occasion." *Nijhawan* v. *Holder*, 557 U. S. 29, 33–34 (2009).[21]  Indeed, the single term "offense" can refer to both in the same statutory scheme. See, *e.g.*, *id.*, at 40; *id.*, at 38 (listing other examples); *United States* v. *Hayes*, 555 U. S. 415, 421–422 (2009).

In *United States* v. *Hayes*, for example, the Court interpreted the term "misdemeanor crime of domestic violence." That term was defined as "an offense" that (1) "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," and (2) was "committed by" a person who has a particular relationship with the victim. §921(a)(33)(A).  The Court interpreted the "offense that . . . has, as an element" language in that provision to focus on the legal prohibition, and interpreted the "offense . . . committed by" language to focus on the defendant's conduct.  See *Hayes*, 555 U. S., at 421–422.  In other words, the term "offense" was used once but had two different meanings as applied to the two different parts of the statutory provision.

Another example is the Immigration and Nationality Act.  That statute defines "aggravated felony" in part as "an offense" (1) that "involves fraud or deceit" and (2) "in which the loss to the victim or victims exceeds $10,000."  8 U. S. C. §1101(a)(43)(M)(i).  The Court interpreted the "offense that . . . involves fraud or deceit" language to focus on the legal prohibition.  See *Kawashima* v. *Holder*, 565 U. S. 478, 483 (2012).  And the Court interpreted the "offense . . . in which the loss" language to focus on the individual's conduct.  See *Nijhawan*, 557 U. S., at 40.  Again, the term "offense" was used once, but had two

---

[21] More generally, this Court has often said that "identical language may convey varying content" in the same statute, based on context. *Yates* v. *United States*, 574 U. S. 528, 537 (2015) (plurality opinion); see also *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 319–320 (2014).

20                UNITED STATES *v.* DAVIS

KAVANAUGH, J., dissenting

different meanings as applied to the two different parts of the statutory provision.

Section 924(c)(3) is the same kind of statutory provision. It likewise encompasses both the legal prohibition (in subpart (A)) and the defendant's actual conduct (in subpart (B)). The term "offense" was read in *Hayes*, *Kawashima*, and *Nijhawan* to encompass both the legal prohibition and the defendant's conduct. The term should be read that same way here.

Moreover, if the substantial-risk prong of §924(c)(3) requires assessing a hypothetical defendant's conduct rather than the actual defendant's conduct, then there would be little daylight between the elements prong and the substantial-risk prong. After all, a crime is defined by its elements. The elements tell you what happens in an ordinary case of a crime. To imagine how a hypothetical defendant would have committed an ordinary case of the crime, you would presumably look back to the elements of the crime. But doing that under the substantial-risk prong—as the Court would do—would just duplicate the inquiry that already occurs under the elements prong. That would defeat Congress' purpose in adding the substantial-risk prong to §924(c)(3)—namely, covering defendants who committed crimes that are not violent by definition but that are committed by particular defendants in ways that create a risk of violence. There is no reason to think that Congress meant to duplicate the elements prong in the substantial-risk prong.[22]

The Court usually tries to avoid an interpretation of a statutory provision that would make the provision redundant and accomplish virtually nothing. See, *e.g.*, *Republic*

---

[22]This duplication point is icing on a textual cake already frosted. In other words, our interpretation of the term "offense" is informed by the text and by our precedents. Our interpretation stands with or without the duplication argument.

*of Sudan* v. *Harrison*, 587 U. S. ___, ___ (2019) (slip op., at 10); *Dastar Corp.* v. *Twentieth Century Fox Film Corp.*, 539 U. S. 23, 35 (2003); *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 837 (1988); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174–179 (2012); W. Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution 112–114 (2016). We should heed that principle here, and recognize that the term "offense" in the substantial-risk prong refers to the actual defendant's conduct during the underlying crime.

In short, the term "offense" in §924(c)(3), as applied to the substantial-risk prong, focuses on the actual defendant's actual conduct, not on a hypothetical defendant's imagined conduct.

*Second*, §924(c)(3)(B) asks whether the defendant's offense "by its nature" involves a risk that physical force may be used. In a vacuum, the "nature" of an offense could be either "the metaphysical 'nature' of the offense" or "the underlying facts of the offense." *Dimaya*, 584 U. S., at ___ (THOMAS, J., dissenting) (slip op., at 24). But that is because the term "offense" could refer to a legal prohibition or to the defendant's actual conduct. As explained above, however, the term "offense" as applied to the substantial-risk prong refers to the actual defendant's conduct during the underlying crime. It follows that "by its nature" focuses on the nature of the actual defendant's conduct during the crime. The phrase "by its nature" is linked to the term "offense." If the term "offense" refers to the defendant's actual conduct, then "by its nature" also focuses on the defendant's actual conduct.

Under the conduct-specific approach to the substantial-risk prong, the "by its nature" language simply means that the Government has to show more than a defendant's proclivity for crime and more than the mere fact that the defendant was carrying a gun. The Government has to

KAVANAUGH, J., dissenting

show that the defendant's conduct by its nature *during the crime* created a substantial risk that physical force may be used.

In short, as JUSTICE THOMAS has pointed out, it "is entirely natural to use words like 'nature' and 'offense' to refer to an offender's actual underlying conduct." *Ibid.* So it is here.

*Third*, §924(c)(3)(B) asks whether the defendant's conduct "involves" a substantial risk that physical force may be used. In *Taylor* v. *United States*, a case involving a prior-conviction statutory provision, the Court pointed to the *absence* of the word "involved" in adopting a categorical approach. 495 U. S., at 600. And in *Nijhawan* v. *Holder*, another case involving a prior-conviction statutory provision, the Court explained that the word "involves" did not support a categorical approach. 557 U. S., at 36. Here, unlike in *Taylor*, the statute does use the word "involves." Under *Taylor*'s reasoning, the inclusion of the word "involves" in §924(c)(3)(B) supports the conclusion that §924(c)(3)(B) employs a conduct-specific approach rather than a categorical approach.

*Fourth*, §924(c)(3)(B)'s use of the phrase "in the course of committing the offense" indicates that the proper focus is on the actual defendant's actual conduct, not on a hypothetical defendant's imagined conduct. After all, the underlying offense was committed by the actual defendant, not by a hypothetical defendant. It strains common sense to think that the "in the course of committing the offense" language in §924(c)(3)(B) contemplates an inquiry into a hypothetical defendant's conduct during an ordinary case of the crime.

Importantly, the law at issue in *Johnson* did not have the "in the course of committing the offense" language. §924(e)(2)(B)(ii). That is a major textual difference between the law in *Johnson* on the one hand and §924(c)(3)(B) on the other hand. And that textual distinc-

tion further shows that §924(c)(3)(B) focuses on the actual defendant's actual conduct.

In short, those four textual indicators, while not all entirely one-sided, together strongly suggest that §924(c)(3)(B) focuses on the actual defendant's actual conduct during the actual crime, not on a hypothetical defendant's imagined conduct during an ordinary case of the crime.

On top of all the language in the statute, §924(c)(3)(B) does *not* contain the critical term that ordinarily marks a categorical approach.

Section 924(c)(3)(B) does not use the term "conviction." This Court has historically recognized the term "conviction" as a key textual driver of the categorical approach. In cases such as *Taylor* and *Johnson*, the Court zeroed in on the word "convictions." See *Johnson*, 576 U. S., at ___ (slip op., at 13); *Taylor*, 495 U. S., at 600; see also *Mathis*, 579 U. S., at ___ (slip op., at 9); *Moncrieffe*, 569 U. S., at 191; *Ovalles*, 905 F. 3d, at 1245. So too, the Court in *Leocal* v. *Ashcroft* emphasized that the text of the INA that incorporated §16(b) used the term "convicted." 543 U. S. 1, 4, 7 (2004).[23]

The term "conviction" is nowhere to be found in the text of §924(c)(3)(B). That should not come as a surprise, given that §924(c)(3)(B) is a substantive criminal offense concerned with the defendant's current-offense conduct. The absence of the term "conviction" in §924(c)(3)(B) strongly

_____

[23] In *Leocal*, the Court interpreted §16(b) to require a categorical approach. But unlike §924(c)(3)(B), that statutory provision applied in the context of past convictions. See 8 U. S. C. §§1101(a)(43)(F), 1227(a)(2)(A)(iii); Sentencing Reform Act of 1984, §217(a), 98 Stat. 2021; Comprehensive Crime Control Act of 1984, §1202, 98 Stat. 2151. To be sure, §16(b) was once incorporated into §924(c). But in 1986, Congress severed the two provisions and included a standalone "crime of violence" definition in §924(c). For those two reasons, §924(c)(3)(B) need not and should not be interpreted in the same way as §16(b).

KAVANAUGH, J., dissenting

supports a conduct-specific approach.

Put simply, the textual clues—both the words that are used and the words that are not used—point strongly to the conclusion that §924(c)(3)(B) requires a jury to assess the actual defendant's actual conduct during the underlying crime. The conclusion becomes overwhelming when considered against the general background of substantial-risk statutes. To be sure, a statute can always be written more clearly. But here, the textual toolkit leads decisively to that conclusion.

## C

But after all of that, suppose that you are not convinced. Suppose that you think that this case is still a close call on the text, even with the background of substantial-risk statutes and the Court's precedents. Indeed, suppose you ultimately disagree with the above analysis of the text. Even so, the Government still wins—unless it can be said that §924(c)(3)(B) *unambiguously* requires a categorical approach. Under the constitutional avoidance canon, the precise question before us is not whether §924(c)(3)(B) is best read to require a conduct-specific approach, but rather (as the Court's cases say) whether §924(c)(3)(B) can reasonably, plausibly, or fairly possibly be interpreted to require a conduct-specific approach. The answer to that question is easy. Yes. See *Hooper* v. *California*, 155 U. S. 648, 657 (1895) ("reasonable"); *Clark* v. *Martinez*, 543 U. S. 371, 380 (2005) ("plausible"); *Skilling* v. *United States*, 561 U. S. 358, 406 (2010) ("fairly possible" (internal quotation marks omitted)).

The Court says that if §924(c)(3)(B) requires the categorical approach, then it is unconstitutionally vague. But the Court also says that if §924(c)(3)(B) focuses on the defendant's actual conduct, then it is constitutionally permissible. As the Court puts it, "a case-specific approach would avoid the vagueness problems that doomed the statutes in

KAVANAUGH, J., dissenting

*Johnson* and *Dimaya*." *Ante*, at 8. So the entire ball game is whether it is fairly possible to interpret §924(c)(3)(B) to require a conduct-specific approach. It surely is at least fairly possible.

It is an elementary principle of statutory interpretation that an ambiguous statute must be interpreted, whenever possible, to avoid unconstitutionality. See generally Scalia, Reading Law: The Interpretation of Legal Texts, at 247–251; Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution, at 317–322. That uncontroversial principle of statutory interpretation dates back to the Founding era. See *Mossman* v. *Higginson*, 4 Dall. 12, 14 (1800). As JUSTICE THOMAS has explained, the traditional doctrine of constitutional avoidance commands "courts, when faced with two plausible constructions of a statute—one constitutional and the other unconstitutional—to choose the constitutional reading." *Clark*, 543 U. S., at 395 (dissenting opinion). This Court's duty is "not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 571 (1973). In discharging that duty, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper*, 155 U. S., at 657.

This Court's longstanding practice of saving ambiguous statutes from unconstitutionality where fairly possible affords proper respect for the representative branches of our Government. The Court has explained that "a presumption never ought to be indulged, that congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the Court by language altogether unambiguous." *United States* v. *Coombs*, 12 Pet. 72, 76 (1838).

In countless cases for more than 200 years, this Court has recognized the principle that courts should construe

ambiguous laws to be consistent with the Constitution. See, *e.g.*, *McDonnell* v. *United States*, 579 U. S. ___, ___–___ (2016) (slip op., at 23–24); *Skilling*, 561 U. S., at 405–409; *Clark*, 543 U. S., at 380–382; *Edmond* v. *United States*, 520 U. S. 651, 658 (1997); *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602, 628–630 (1993); *New York* v. *United States*, 505 U. S. 144, 170 (1992); *Rust* v. *Sullivan*, 500 U. S. 173, 190–191 (1991); *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 465–467 (1989); *Communications Workers* v. *Beck*, 487 U. S. 735, 762 (1988); *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575–578 (1988); *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U. S. 772, 780–781 (1981); *Letter Carriers*, 413 U. S., at 571; *Machinists* v. *Street*, 367 U. S. 740, 749–750 (1961); *Ashwander* v. *TVA*, 297 U. S. 288, 348 (1936) (Brandeis, J., concurring); *ICC* v. *Oregon-Washington R. & Nav. Co.*, 288 U. S. 14, 40–42 (1933); *Crowell* v. *Benson*, 285 U. S. 22, 62–63 (1932); *Lucas* v. *Alexander*, 279 U. S. 573, 577–578 (1929); *Richmond Screw Anchor Co.* v. *United States*, 275 U. S. 331, 345–346 (1928); *Blodgett* v. *Holden*, 275 U. S. 142, 148–149 (1927) (opinion of Holmes, J.); *Missouri Pacific R. Co.* v. *Boone*, 270 U. S. 466, 471–472 (1926); *Linder* v. *United States*, 268 U. S. 5, 17–18 (1925); *Panama R. Co.* v. *Johnson*, 264 U. S. 375, 390 (1924); *Texas* v. *Eastern Texas R. Co.*, 258 U. S. 204, 217 (1922); *Baender* v. *Barnett*, 255 U. S. 224, 225–226 (1921); *United States* v. *Jin Fuey Moy*, 241 U. S. 394, 401 (1916); *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 407–408 (1909); *Hooper*, 155 U. S., at 657; *Grenada County Supervisors* v. *Brogden*, 112 U. S. 261, 268–269 (1884); *Coombs*, 12 Pet., at 76; *Parsons* v. *Bedford*, 3 Pet. 433, 448–449 (1830); *Mossman*, 4 Dall., at 14.

To be clear, the case before us is not a case of avoiding

KAVANAUGH, J., dissenting

*possible* unconstitutionality. This is a case of avoiding *actual* unconstitutionality. There is a debate about the former practice. There is no real debate about the latter rule. And it is the latter rule of statutory interpretation at issue here.

Section 924(c)(3)(B) is best read to focus on the defendant's actual conduct. But at a minimum—given the text, the background of substantial-risk laws, and the relevant precedents—it is fairly possible to interpret §924(c)(3)(B) to focus on the defendant's actual conduct. Because that reasonable interpretation would save §924(c)(3)(B) from unconstitutionality, this case should be very straightforward, as Judge Newsom explained in his thorough majority opinion in the Eleventh Circuit and as Judge Niemeyer and Judge Richardson explained in their persuasive separate opinions in the Fourth Circuit. *Ovalles*, 905 F. 3d, at 1251; *Simms*, 914 F. 3d, at 272 (opinion of Niemeyer, J.); *id.*, at 272–277 (opinion of Richardson, J.). We should prefer the constitutional reading over the unconstitutional reading.

The Court did not apply constitutional avoidance in *Johnson* and *Dimaya*. Why not? In those two cases, the Court explained, the canon of constitutional avoidance was essentially rendered a nullity. That is because, as the Court described the situation, the Court was between a rock and a hard place. The categorical approach would have led to Fifth Amendment vagueness concerns, whereas applying the conduct-specific approach would have led to Sixth Amendment jury-trial concerns. See *Dimaya*, 584 U. S., at ___–___ (plurality opinion) (slip op., at 13–14).

Here, by contrast, the Court is not between a rock and a hard place. Applying the categorical approach to §924(c)(3)(B) would lead to vagueness concerns, whereas applying the conduct-specific approach would lead to no constitutional concerns.

Faced with a choice between a rock and constitutionality,

28                UNITED STATES *v.* DAVIS

KAVANAUGH, J., dissenting

the Court chooses the rock. I do not understand that
choice.

The Court offers two related reasons for its choice to run
the statute into a rock. Neither reason holds up.

*First*, the Court concludes that the constitutional avoid-
ance canon must yield to the rule of lenity. That argu-
ment disregards the Court's oft-repeated statements that
the rule of lenity is a tool of last resort that applies "only
when, after consulting traditional canons of statutory
construction," grievous ambiguity remains. *Hayes*, 555
U. S., at 429 (internal quotation marks omitted); see also,
*e.g.*, *Ocasio* v. *United States*, 578 U. S. ___, ___, n. 8 (2016)
(slip op., at 13, n. 8) ("after seizing everything from which
aid can be derived" (internal quotation marks omitted));
*Muscarello* v. *United States*, 524 U. S. 125, 138 (1998)
(same); *United States* v. *Wells*, 519 U. S. 482, 499 (1997)
(same); *Reno* v. *Koray*, 515 U. S. 50, 65 (1995) (same);
*United States* v. *Shabani*, 513 U. S. 10, 17 (1994) ("after
consulting traditional canons of statutory construction");
*Smith* v. *United States*, 508 U. S. 223, 239 (1993) ("after
seizing every thing from which aid can be derived" (inter-
nal quotation marks and alterations omitted)); *Moskal* v.
*United States*, 498 U. S. 103, 108 (1990) ("*after* resort to
the language and structure, legislative history, and moti-
vating policies of the statute" (internal quotation marks
omitted)); *Callanan* v. *United States*, 364 U. S. 587, 596
(1961) ("at the end of the process of construing what Con-
gress has expressed").

The constitutional avoidance canon is a traditional
canon of statutory interpretation. The constitutional
avoidance canon is employed to reach a reasonable inter-
pretation of an ambiguous statute. Where, as here, that
canon applies and yields such a reasonable interpretation,
no grievous ambiguity remains. The rule of lenity has no
role to play. Contrary to the Court's assertion, the canon
of constitutional avoidance is not "at war" with the rule of

KAVANAUGH, J., dissenting

lenity. *Ante*, at 19. The canon of constitutional avoidance precedes the rule of lenity because the rule of lenity comes into play (this Court has said countless times) only "*after* consulting traditional canons of statutory construction." *Hayes*, 555 U. S., at 429 (emphasis added; internal quotation marks omitted). The rule of lenity "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Callanan*, 364 U. S., at 596.

In addition, the rule of lenity is triggered only in the face of "grievous ambiguity." *Muscarello*, 524 U. S., at 139 (internal quotation marks omitted). To reiterate, §924(c)(3)(B) is best read to focus on the actual defendant's actual conduct. But to the extent that there is any ambiguity in §924(c)(3)(B), that ambiguity is far from grievous.

*Second*, and relatedly, the Court claims that the canon of constitutional avoidance, as a general matter, cannot be relied upon to broaden the scope of a criminal statute, as opposed to narrowing the scope of a criminal statute. And the Court says that the canon cannot be used here because, in the Court's view, relying on the constitutional avoidance canon in this case would expand the scope of §924(c)(3)(B). I disagree for two independent reasons.

To begin with, that theory seems to come out of nowhere. The Court's novel cabining of the constitutional avoidance canon is not reflected in this Court's precedents. On the contrary, it contradicts several precedents. This Court has applied the constitutional avoidance canon even when avoiding the constitutional problems would have broadened the statute's scope. For example, in *United States* v. *Culbert*, this Court rejected a narrowing construction of the Hobbs Act because that construction would have raised vagueness concerns. 435 U. S. 371, 374 (1978); see also *United States* v. *Shreveport Grain & Elevator Co.*, 287 U. S. 77, 82 (1932); cf. *United States* v.

30                UNITED STATES *v.* DAVIS

KAVANAUGH, J., dissenting

*Grace*, 461 U. S. 171, 176 (1983).

Moreover, the premise of this novel broadening/narrowing theory is flawed. A categorical approach to §924(c)(3)(B) would not be inherently narrower than a conduct-specific approach. Each approach would sweep in some crimes that the other would not. On the one hand, some crimes that might be deemed categorically violent sometimes may be committed in nonviolent ways. Those crimes would be covered by the categorical approach but not by a conduct-specific approach. On the other hand, some categorically nonviolent crimes are committed in violent ways. Those crimes would not be covered by the categorical approach but would be covered by a conduct-specific approach. See *Johnson*, 576 U. S., at ___ (ALITO, J., dissenting) (slip op., at 12).

In sum, the constitutional avoidance canon makes this an especially straightforward case. It is at least fairly possible to read §924(c)(3)(B) to focus on the actual defendant's actual conduct during the actual crime. End of case.

### III

The consequences of the Court's decision today will be severe. By invalidating the substantial-risk prong of §924(c)(3), the Court's decision will thwart Congress' law enforcement policies, destabilize the criminal justice system, and undermine safety in American communities. If the law required those results, we would have to swallow the consequences. But the law, in my respectful view, does no such thing.

The Court's decision means that people who in the future commit violent crimes with firearms may be able to escape conviction under §924(c). In enacting §924(c), Congress sought to keep firearms away from violent criminal situations. Today, the Court invalidates a critical provision designed to achieve that goal. To be sure, many

KAVANAUGH, J., dissenting

violent crimes still might fall within §924(c)(3)'s elements clause. But many others might not. When defendants use firearms during conspiracies to commit robbery, arsons, attempted carjackings, and kidnapings, to name just a few, they might no longer be subject to prosecution under §924(c). See, *e.g.*, *Simms*, 914 F. 3d, at 233–234 (conspiracy to commit robbery); *United States* v. *Salas*, 889 F. 3d 681, 683–684 (CA10 2018) (arson); *United States* v. *Jenkins*, 849 F. 3d 390, 393 (CA7 2017) (kidnaping).

To get a flavor of the offenders who will now potentially avoid conviction under §924(c), consider a sample of those offenders who have been convicted under §924(c)(3)'s substantial-risk prong:

- One defendant committed assault with intent to commit murder. The defendant shot his wife multiple times while the couple was camping in Buffalo River National Park. See *United States* v. *Prickett*, 839 F. 3d 697, 698 (CA8 2016).

- One defendant committed arson. The defendant used a molotov cocktail to firebomb the Irish Ink Tattoo Shop. See *Salas*, 889 F. 3d, at 683; *United States* v. *Salazar*, 2014 WL 12788997, *1 (NM, Aug. 14, 2014).

- One defendant and others kidnaped a man who they believed had stolen money and an Xbox from the defendant. They beat the man severely and threatened to kill him. See Pet. for Cert. in *United States* v. *Jenkins*, O. T. 2017, No. 17–97, p. 2.

- One defendant committed conspiracy to commit robbery. The defendant and his co-conspirators planned to steal Percocet and cash from a man they thought was a drug dealer. Armed with a pistol and a crowbar, they broke into the man's home by shattering a sliding glass door and found three men there. One of the defendant's co-conspirators attacked all three men with the crowbar, and the defendant threatened the

KAVANAUGH, J., dissenting

men with a pistol multiple times. See *United States* v. *Douglas*, 907 F. 3d 1, 4–5 (CA1 2018).

- One defendant committed attempted carjacking. Armed with guns and baseball bats, the defendant and her co-conspirators robbed a grocery store and carjacked two vehicles, pistol whipping the owner of one of the vehicles in the process. They then attempted to carjack a third vehicle. They approached a family getting out of a minivan and demanded the keys. One of the defendant's co-conspirators hit a 13-year-old girl in the mouth with a baseball bat. Another shot an AK–47 at the girl's family. See *Ovalles*, 905 F. 3d, at 1235.

- One defendant operated multiple houses of prostitution in Annapolis. The defendant threatened perceived competitors with violence. He also beat and threatened women, sometimes to compel them to engage in prostitution. See *United States* v. *Fuertes*, 805 F. 3d 485, 490–492 (CA4 2015).

- One defendant committed conspiracy to commit robbery. In the middle of the night, the defendant and a co-conspirator crawled into a McDonald's through the drive-through window. The defendant pointed a gun at the restaurant's manager and attempted to hit another employee. The defendant demanded money, and the manager complied. The defendant then removed the money from the cash drawer, pistol whipped the manager, threw the cash drawer at the other employee, and fled the scene along with his co-conspirators and $1,100. See *Simms*, 914 F. 3d, at 232.

- One defendant committed conspiracy to commit robbery. The defendant and his co-conspirators committed a string of armed robberies of small businesses. During the robberies, they wore masks and gloves.

KAVANAUGH, J., dissenting

They were armed with guns, knives, and baseball bats. They injured several people during the course of their robberies, breaking bones, drawing blood, and knocking people out. They also shot and killed one of their victims point blank. See *Barrett*, 903 F. 3d, at 170, 184.

Those real-life stories highlight a second unfortunate consequence of the Court's decision. Many offenders who have already committed violent crimes with firearms—and who have already been convicted under §924(c)—may be released early from prison. The Court's decision will apply to all defendants whose convictions are not yet final on direct review and who preserved the argument. With the benefit of this Court's decision, many dangerous offenders who received lengthy prison sentences as a result of their violent conduct might walk out of prison early. And who knows whether the ruling will be retroactive? Courts will be inundated with collateral-review petitions from some of the most dangerous federal offenders in America. As Judge Niemeyer wrote in his separate opinion in the Fourth Circuit, "thousands of §924(c)(1) convictions will unnecessarily be challenged as premised on what the majority today concludes is an unconstitutionally vague provision, even though the parties in those cases had little difficulty understanding, enforcing, or defending the §924(c)(1) charges at issue." *Simms*, 914 F. 3d, at 264.

Moreover, defendants who successfully challenge their §924(c) convictions will not merely be resentenced. Rather, their §924(c) convictions will be thrown out altogether. That is because, to restate an obvious point, §924(c) defines a substantive criminal offense. To be sure, the §924(c) defendants may also be serving other sentences for other convictions (for instance, if they were convicted of and sentenced for the underlying crime of violence). But with the benefit of the Court's decision, they may be able to get their §924(c) convictions tossed and lop off years—

potentially decades—from their total prison time.

All because the Court thinks that §924(c)(3)(B) *unambiguously* compels a focus on the imagined conduct of a hypothetical defendant rather than on the actual conduct of the actual defendant. That analysis is not persuasive, especially in light of the constitutional avoidance doctrine. It is true that the Government once advocated for a categorical approach. But in the early years after Congress added a "crime of violence" definition to §924(c), before courts settled on a categorical approach, the Government correctly argued for a conduct-specific approach to the substantial-risk prong. See, *e.g., United States* v. *Cruz,* 805 F. 2d 1464, 1469 (CA11 1986). The Government later changed its tune only after the courts settled on a categorical approach—at a time when it did not matter for constitutional vagueness purposes, before *Johnson* and *Dimaya.* In any event, the question is what to do now after *Johnson* and *Dimaya.* The answer should not be hard. To quote Judge William Pryor, writing for five judges in the Eleventh Circuit, how "did we ever reach the point where" we "must debate whether a carjacking in which an assailant struck a 13-year-old girl in the mouth with a baseball bat and a cohort fired an AK–47 at her family is a crime of violence? It's nuts." *Ovalles,* 905 F. 3d, at 1253 (concurring opinion).

To be sure, the consequences cannot change our understanding of the law. But when the consequences are this bad, it is useful to double-check the work. And double-checking here, in my view, reveals several problems: relying on cases from the prior-conviction context whose rationales do not apply in this current-offense context; not fully accounting for the long tradition of substantial-risk criminal statutes; not reading the words of the statute in context and consistent with precedents such as *Hayes;* and then, perhaps most problematically, misapplying the longstanding constitutional avoidance canon. After

KAVANAUGH, J., dissenting

double-checking, it should be evident that the law does not compel those serious consequences. I am not persuaded that the Court can blame this decision on Congress. The Court has a way out, if it wants a way out.

\*     \*     \*

The Court usually reads statutes with a presumption of rationality and a presumption of constitutionality. Instead of reading §924(c)(3)(B) to ensure that it is constitutional, the Court reads §924(c)(3)(B) in a way that makes it unconstitutional. The bedrock principle that the Court interprets ambiguous statutes to avoid unconstitutionality is seemingly transformed into a principle of interpreting ambiguous statutes to lead to unconstitutionality.

I respect and entirely understand how the Court got here. *Johnson* and *Dimaya* were earth-rattling decisions. But we should not follow *Johnson* and *Dimaya* off the constitutional cliff in this different §924(c) context. Unlike the statutes at issue in *Johnson* and *Dimaya*, this statute is not a prior-conviction statute. This statute operates entirely in the present and is not remotely vague. I respectfully dissent.

14-2641-cr
*United States v. Barrett*

# In the
# United States Court of Appeals
## for the Second Circuit

---

AUGUST TERM 2015

No. 14-2641-cr

UNITED STATES OF AMERICA,
*Appellee,*

v.

DWAYNE BARRETT, AKA SEALED DEFENDANT 3, AKA TALL MAN,
*Defendant-Appellant,*

FAHD HUSSAIN, AKA ALI, AKA MOE, TAMESHWAR SINGH, AKA
SEALED DEFENDANT 5, SHEA DOUGLAS, JERMAINE DORE, AKA ST.
KITTS, AKA BLAQS, TAIJAY TODD, AKA SEALED DEFENDANT 4, AKA
BIGGS, DAMIAN CUNNINGHAM, AKA JABA,

*Defendants.*

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: JANUARY 22, 2016
DECIDED: AUGUST 30, 2019

---

Before: WINTER, RAGGI, and DRONEY, *Circuit Judges.*

---

1

14-2641-cr
*United States v. Barrett*

On appeal from a judgment entered in the United States District Court for the Southern District of New York (Sullivan, *J.*) following a jury trial, defendant challenged his conviction for using firearms in the commission of violent crimes, *see* 18 U.S.C. § 924(c)(1)(A), in one case causing death, *see id.* § 924(j).   Defendant argued that the predicate felonies for these firearms offenses—substantive and conspiratorial Hobbs Act robbery, *see id.* § 1951—are not "crime[s] of violence" within the meaning of § 924(c)(3), a conclusion he maintained was compelled by *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and *Johnson v. United States*, 135 S. Ct. 2551 (2015).  This court rejected this argument for reasons explained in *United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018).   Our judgment affirming defendant's conviction has now been vacated by the Supreme Court, and the case remanded for further consideration in light of *United States v. Davis*, 139 S. Ct. 2319 (2019).  Upon such consideration, the court concludes that Barrett's Count Two conviction for using firearms in the commission of Hobbs Act robbery conspiracy must be vacated, but that his conviction continues to warrant affirmance in all other respects.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

————————

KELLEY J. SHARKEY, ESQ., Brooklyn, New York, *for Defendant-Appellant*.

MICHAEL D. MAIMIN, Assistant United States Attorney (Amy R. Lester, Jessica A. Masella, Karl Metzner, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

14-2641-cr
*United States v. Barrett*

_____

R<small>EENA</small> R<small>AGGI</small>, *Circuit Judge*:

In 2018, this court affirmed defendant Dwayne Barrett's conviction after trial in the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) for multiple counts of conspiratorial and substantive Hobbs Act robbery and related counts of using a firearm during and in relation to these robbery crimes. *See* 18 U.S.C. §§ 924(c), 924(j), 1951; *United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018). The Supreme Court has now vacated our judgment and remanded for further consideration in light of *United States v. Davis*, 139 S. Ct. 2319 (2019). *See Barrett v. United States*, 139 S. Ct. 2774 (2019). Having given that consideration, we now vacate Barrett's Count Two § 924(c) conviction for using a firearm in committing Hobbs Act robbery conspiracy—the only count of conviction that Barrett challenges in light of *Davis*. For the reasons stated in our 2018 opinion, and the summary order filed that same day, *see United States v. Barrett*, 750 F. App'x 19 (2d Cir. 2018), we affirm Barrett's conviction in all other respects and remand for resentencing in light of our partial vacatur.[1]

We are obliged to vacate Barrett's Count Two conviction because *Davis* precludes us from concluding, as we did in our original opinion, that Barrett's Hobbs Act robbery conspiracy crime qualifies as a § 924(c) crime of violence. At the outset, we note that there can be no question but that the particular Hobbs Act robbery conspiracy committed by Barrett and his co-conspirators was violent, even murderous. *See United States v. Barrett*, 903 F.3d at 170–71, 184 (detailing how violence was "hallmark of the charged conspiracy,"

---

[1] We assume familiarity with our earlier opinion and order, which detail the facts of Barrett's crimes and quote the statutes relevant to his convictions.

with robbers routinely using "guns, knives, baseball bats, and their fists," to break victims' bones, render them unconscious, and "in one case point blank to kill a robbery target"). There is also no question, however, that, in *Davis*, 139 S. Ct. 2319 (2019), the Supreme Court held that a crime could not be identified as a crime of violence under § 924(c)—even by a trial jury—on a case-specific basis. The decision must be made categorically. In so holding, the Supreme Court acknowledged that a case-specific approach to § 924(c), particularly to the statute's residual clause, *see* 18 U.S.C. § 924(c)(3)(B), would avoid both the Sixth Amendment and vagueness concerns that have doomed other, similarly worded residual clauses, *see United States v. Davis*, 139 S. Ct. at 2327 (citing *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018); *Johnson v. United States*, 135 S. Ct. 2551 (2015)). Nevertheless, the Court held that the text, context, and history of § 924(c) could not support such an approach. *See id.* at 2327–33.

In *Barrett*, this court had relied, at least in part, on a case-specific approach to recognize the charged Hobbs Act robbery conspiracy as a crime of violence under § 924(c)(3)(B). *See United States v. Barrett*, 903 F.3d at 178–84. The decision was hardly quixotic. Two other circuit courts have done the same. *See United States v. Douglas*, 907 F.3d 1 (1st Cir. 2018), *vacated*, 139 S. Ct. 2775 (2019); *Ovalles v. United States*, 905 F.3d 1231 (11th Cir. 2018) (*en banc*). And in *Davis* itself, four members of the Supreme Court reached the same conclusion. *See United States v. Davis*, 139 S. Ct. at 2336–55 (Kavanaugh, J., with Roberts, C.J., Thomas and Alito, JJ., dissenting). Still, four represents a minority viewpoint within the Supreme Court. Insofar as the Court has now instructed us to reconsider Barrett's appeal of conviction in light of *Davis*, we are obliged to follow the majority's holding that (1) § 924(c)(3)(B) "commands the categorical approach," *id.* at 2328; and (2) under the particular form of categorical approach applied to

14-2641-cr
*United States v. Barrett*

residual clauses, *i.e.*, the "ordinary case" inquiry identified in *James v. United States*, 550 U.S. 192, 208 (2007), "§ 924(c)(3)(B) is unconstitutionally vague," *United States v. Davis*, 139 S. Ct. at 2336.

Invited to brief the effect of *Davis*'s holding on this appeal, the prosecution and the defense agree that Barrett's Count Two conviction for using a firearm in committing Hobbs Act robbery *conspiracy* must be vacated because the identification of that crime as one of violence depends on the § 924(c)(3)(B) residual clause definition, which *Davis* has now pronounced unconstitutionally vague.

Neither party argues that *Davis* requires vacatur of Barrett's Count Four, Six, or Seven § 924(c) convictions.  This is not surprising.  The predicate offense for each of these crimes is *substantive* Hobbs Act robbery, which can be identified as a crime of violence under § 924(c)(3)(A) applying the traditional, elements only, categorical approach not at issue in *Davis*.  *See United States v. Hill*, 890 F.3d 51, 53, 60 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 844 (2019).  Thus, for the reasons stated in our original opinion, we again affirm Barrett's convictions on Counts Four, Six, and Seven.  *See United States v. Barrett*, 903 F.3d at 174.[2]

---

[2] In upholding Barrett's Count Seven § 924(j) conviction for causing death in the course of a violation of § 924(c), we summarily rejected his argument that the district court erred in imposing a 25-year consecutive sentence for that crime because § 924(j) does not incorporate the penalty enhancements of § 924(c)(1)(C)(i), or the consecutive sentencing mandate of § 924(c)(1)(D)(ii).  Because this is the fourth panel to reach that conclusion summarily, the government asks that we publish in a precedential opinion that part of our summary order construing § 924(j) to incorporate § 924(c)'s sentencing enhancements.  *See* Gov't Supp. Br. at 6.  We grant that request by here repeating what we said in our summary order:

> In sentencing Barrett under § 924(j), the district court cited *United States v. Young*, 561 F. App'x 85, 93–94 (2d Cir. 2014), a non-precedential summary

5

14-2641-cr
*United States v. Barrett*

As to Barrett's Count Two conviction, however, *Davis* compels vacatur.  The Supreme Court's unequivocal rejection of a case-specific approach to § 924(c)(3)(B) precludes further reliance on the particular murderous violence of Barrett's robbery conspiracy to identify that offense as a crime of violence predicate under § 924(c)(3)(B).

Our original *Barrett* decision to affirm was not, however, based only on a now-discredited case-specific application of § 924(c)(3)(B). Our first ground for affirming Barrett's Count Two conviction was a determination that Hobbs Act robbery conspiracy could be categorically identified as a crime of violence by reference only to its elements, thereby avoiding the vagueness concerns of the ordinary-case form of categorical analysis rejected in *Johnson, Dimaya*, and now *Davis*.  *See id.* at 176–77.  *Barrett*'s elements-based conclusion, however, depended on *both* § 924(c)(3)(A) and § 924(c)(3)(B). We reasoned that where the elements of a conspiracy's object crime (here, Hobbs Act robbery) establish it as a categorical crime of violence under § 924(c)(3)(A), the agreement element of a conspiracy categorically establishes the "substantial risk" of violence under § 924(c)(3)(B).  *See id.*

The Supreme Court did not discuss, much less expressly reject, this hybrid categorical approach in *Davis*.  This is hardly surprising; the matter was not before it.   Nevertheless, *Davis* gives us reason to think that we can no longer rely on such a categorical approach to

---

order construing § 924(j) to incorporate the § 924(c) penalty enhancements. Other panels of this court recently reached the same conclusion, again summarily.  *See United States v. Ventura*, No. 15-2675, 2018 WL 3814729, at *2 (2d Cir. Aug. 10, 2018); *United States v. Nina*, 734 F. App'x 27, 36 (2d Cir. 2018).  While Barrett urges us to reject *Young*'s, *Ventura*'s, and *Nina*'s reasoning, we are not persuaded.

*United States v. Barrett*, 750 F. App'x at 23.

affirm Barrett's conviction on Count Two.   As the government observes, "[d]espite the obvious logic" of this court's elements analysis, "it still necessarily depends" in part on § 924(c)(3)(B), which *Davis* leaves "no longer valid in any form."   Gov't Supp. Br. at 3 (quoting *Davis*'s holding "that § 924(c)(3)(B) is unconstitutionally vague," and its pronouncement that "a vague law is no law at all," 139 S. Ct. at 2323, 2336)).   The conclusion is only reinforced by language in *Davis* referencing the "ordinary case" inquiry as the *required* categorical approach in applying residual clauses such as § 924(c)(3)(B).   *See United States v. Davis*, 139 S. Ct. at 2326 (observing that "ACCA's residual clause *required* judges to use a form of what we've called the 'categorical approach' to determine whether an offense qualified as a violent felony" (emphasis added)); *id.* (stating that "[f]or years, almost everyone understood § 924(c)(3)(B) to *require* exactly the same [ordinary-case] categorical approach that this Court found problematic in the residual clauses of the ACCA and § 16" (emphasis added)).   Might the Supreme Court have made these "requirement" observations in *Davis* without considering the possibility of using an elements-only approach to identify a conspiracy to commit a categorically violent crime under § 924(c)(3)(A) as itself a categorically violent crime under § 924(c)(3)(B)?   Perhaps.   But the possibility does not support affirmance of Count Two here.

If there is anything *Davis* makes clear, it is the Supreme Court's conviction that the substantially similar residual clause definitions for a violent crime in ACCA, in § 16(b), and in § 924(c)(3)(B) are unconstitutionally vague, and its aversion to new arguments that attempt to avoid that conclusion. *See id.* at 2327 (rejecting government's attempt, in aftermath of Court's decisions holding ACCA and § 16(b) residual clauses unconstitutionally vague, to

14-2641-cr
*United States v. Barrett*

"abandon[] its longstanding position" that § 924(c)(3)(B) requires ordinary-case categorical analysis and to urge "new case-specific approach").

Thus, however much this court may have thought it possible to avoid an unconstitutionally vague application of § 924(c)(3)(B) in *Barrett*—either by a categorical consideration of only the elements of the predicate Hobbs Act robbery conspiracy, or by a case-specific consideration of the violent nature of Barrett's particular conspiracy—we understand *Davis* to foreclose both these rationales for decision.   The Supreme Court having there construed § 924(c)(3)(B) (1) not to admit case-specific application, and (2) to be unconstitutionally vague without qualification when applied categorically, this court can no longer rely to any extent on what is now "no law at all," *id.* at 2323, to uphold Barrett's Count Two conviction.

Accordingly, for the reasons stated herein, we VACATE Barrett's conviction on Count Two.  At the same time, for the reasons stated in our earlier opinion and summary order, we AFFIRM Barrett's conviction in all other respects.  We REMAND this case to the district court for resentencing in light of our partial vacatur.

8